**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **THOMAS MICHAEL SMITH and** | ) | |
| **MONALETO D. SNEED,** | ) | |
| | ) | **No. 3:21-cv-00262** |
| **Plaintiffs,** | ) | |
| | ) | **Judge Richardson** |
| **v.** | ) | **Magistrate Judge Holmes** |
| | ) | |
| **P.A.M. TRANSPORT, INC.,** | ) | **Jury Demand** |
| | ) | |
| **Defendant.** | ) | |

## RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs Thomas Michael Smith and Monaleto D. Sneed ("Plaintiffs") file this Response in Opposition to the Motion for Summary Judgment (Doc. 24) filed by Defendant P.A.M. Transport, Inc. ("Defendant"), and request that the Court deny the motion.

## INTRODUCTION

This is an employment discrimination, hostile work environment, and retaliation case. Plaintiff Sneed brings his claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the Tennessee Human Rights Act, Tenn. Code Ann. 4-21-101, *et seq*. ("THRA"). Plaintiff Smith brings his claims under § 1981. Throughout their employment with it, Defendant discriminated and retaliated against Plaintiffs because of race and/or for opposing and reporting its illegal discriminatory conduct. Defendant further subjected Plaintiffs to a racially hostile and abusive work environment. As demonstrated below, the record presents numerous genuine issues of material fact as to Plaintiffs' claims and a reasonable jury could find in their favor on them. Accordingly, Plaintiffs request that the Court deny Defendant's motion.

**FACTS**

Plaintiffs were employed by Defendant as local drivers dispatched out of its Nashville Whites Creek location. Smith Dep. at 31-32; Wright Dep. at 11.[1] Defendant had 10 to 15 drivers in Nashville, four of whom were African American, including Plaintiffs. Smith Dep. at Wright Dep. at 12, 44; Smith Dep. at 25-26; Sneed Dep. at 66-68.

During their employment with Defendant, Plaintiffs suffered continuous acts of race discrimination and a racially hostile work environment. For example, Defendant assigned Plaintiffs and other African American drivers heavier workloads and required them to work longer days and more and longer driving routes than their non-African American counterparts. This resulted in Plaintiffs receiving less pay per hour for their work than the non-African American drivers. Smith Dep. at 33-35, 52-53, 68-69, 71-73, 76; Sneed Dep. at 90, 95-97, 123-24, 136-38, 146-47, 150. Defendant also assigned Plaintiffs and other African American drivers older, damaged, and less desirable trucks than it assigned its non-African American drivers. Smith Dep. at 36-37, 63-65, 72, 76; Sneed Dep. at 78-82, 138, 141.

Furthermore, Plaintiffs' supervisors, including Driver Manager/Dispatcher Jermaine Davis and Davis' supervisor, Caucasian Operations Manager Jordan Claytor, repeatedly used the term "monkey ass" when referring to Plaintiffs. Smith Dep. at 46-47, 54, 56, 95; Sneed Dep. at 153-55; Wright Dep. at 14-15. Additionally, Davis and Claytor spoke to Plaintiffs and other African American drivers in an extremely hostile and abusive manner. Davis and Claytor cussed, screamed, criticized, belittled, talked down to, and threatened Plaintiffs and other African American drivers with discipline and discharge. Plaintiffs noticed that they did not treat

---

[1] Citations to the deposition transcripts and exhibits filed with this response are by deponent last name and page or exhibit number. Holly Wright served as Defendant's designated Rule 30(b)(6) corporate representative and testified on its behalf. Wright Dep. at 9.

Defendant's non-African American drivers this way.  Smith Dep. at 53-56, 76, 78; Sneed Dep. at 125-26, 131-32, 152-55.  Defendant's discriminatory and abusive treatment of Plaintiffs interfered with their job performance and made it more difficult for them to perform their jobs. Smith Dep. at 56-59; Sneed Dep. at 132-35.

Under Defendant's driver manual and anti-discrimination and harassment policy, Plaintiffs were permitted to complain to any manager about discrimination.  Wright Dep. at 25, 35.  Its Driver Manual Preface stated that concerns could be brought "to the attention of the Driver Liaison, your Driver Manager, Operations Manager, or the Driver Resources Department." Sneed Dep. Ex. 3 at 49.  Its Anti-Discrimination and Harassment Policy stated, "Drivers who have concerns of harassment or who observe harassment should report such conduct to a Supervisor, Driver/Fleet Manager or HR.  Reports will be promptly investigated." *Id.* at 53.

Plaintiffs continuously opposed Davis' and Claytor's discriminatory comments and treatment of them throughout their employment.  Sneed Dep. at 110-11; Smith Dep. at 45-46, 69-70, 76-77, 171-72.  They repeatedly reported and complained about Davis' and Claytor's discriminatory comments and racially disparate treatment of them to other managers, including James Brown, Tyrone Luckett, Keith Coatney, and Fred Meek. Smith Dep. at 45-47, 76-77; Sneed Dep. at 104-111, 117, 174-77, 181; Wright Dep. at 14-15, 59-63.  Like Luckett, Brown was a Driver Liaison.  Wright Dep. at 59-60, 62.  Unlike Driver Managers, Driver Liaisons had the authority to terminate drivers' employment. Wright Dep. at 14.  Indeed, Luckett made the decision to terminate Sneed's employment. Wright Dep. at 53-54; Sneed Dep. Ex. 3 at 106, 108.

Plaintiffs repeatedly reported that they and other African American drivers were being assigned heavier workloads and having to work longer days and drive more routes than their

non-African American counterparts, resulting in their receiving less pay per hour for their work. They complained "on numerous occasions" and "several times" about the fact that the routes they were assigned were longer and took more time to complete than those that Defendant assigned to non-African American drivers. Smith Dep. 46-48, 69-70, 72-74; Sneed Dep. at 95-98, 104-05, 108-09, 115, 117, 136-37, 148, 150. Plaintiffs complained about the fact that Davis and Claytor were using racially derogatory terms to and about them and other African American drivers, including "monkey ass," and belittling and mistreating them. Smith Dep. at 46-47; 153-55. They complained that they were being assigned older and less desirable trucks than the non-African American drivers. Smith Dep. at 64; Sneed Dep. at 148-49. They complained about the fact that they did not receive job training equal to that which non-African American drivers received. Smith Dep. at 26-27, 59-62; Sneed Dep. at 137-42.

Defendant never took any action in response to Plaintiffs' repeated complaints of racial discrimination and harassment. Smith Dep. at 77-78; Sneed Dep. at 108-09, 119, 142, 176-77. Defendant conducted no investigation at any time. Wright Dep. at 36, 50. In response to Smith's complaints, Davis and his predecessor told him, "You get what you get," "That's part of it," and "Maybe you need . . . to find another job." Smith Dep. at 70, 74-75. Brown admitted that "it shouldn't be going on" and stated that "[h]e would check into it." *Id*. at 64, 77-78. The race discrimination and harassment continued, however, after Plaintiffs complained about it. "Nothing was ever done," "It didn't get any better," and Defendant retaliated against Plaintiffs for complaining about it. Smith Dep. at 78-79; Sneed Dep. at 116, 119, 142, 156-57, 171-72.

Defendant has a progressive discipline policy and practice. Wright Dep. at 26-27; Sneed Dep. Ex. 3 at 55. During their employment with Defendant, neither Plaintiff was formally disciplined or written up. Wright Dep. at 32, 48; Sneed Dep. at 131-32, 158, 160; Smith Dep. at

58, 80. Smith ultimately left his employment with Defendant due to continuous race discrimination, harassment, and intolerable working conditions. Smith Dep. at 59.

In Defendant's Driver Review Details for Sneed, Supervisor Charles Dinkins documented that Sneed was a "Reliable driver, no issues to report" as of February 10, 2020. Sneed Dep. Ex. 3 at 104. On February 24, 2020, he documented that Sneed "continues to be a valuable asset to the TRR team." *Id.* On March 20, 2020, Dinkins again documented that Sneed was a "reliable driver, no issues to report." *Id.* Sneed "never had any complaints" about his work, "never had any write-ups," and "never had any accidents" while working for Defendant. Sneed Dep. at 131-32, 157-58, 160-63. He never picked up a load and failed to deliver it; never missed a delivery deadline through any fault of his own; never refused to clean out a trailer; never went home or left work without telling anyone; was not counseled about spending too long at truck stops; and did not recall ever failing to respond to a communication from his supervisor. *Id.* at 160-63. Nevertheless, Defendant discharged Sneed following his complaints to it about racial discrimination and harassment. *Id*. at 131-32, 157-58, 160-63.

Defendant has "no idea" and "d[oes] not know" who replaced either Plaintiff, despite that being a specifically designated topic in Plaintiffs' Rule 30(b)(6) Notice of Deposition to it. Wright Dep. 45, 55; Notice of Filing, Notice of Deposition to Defendant at 3, ¶ 21. This is not the first time that Defendant has been accused of race discrimination by a former employee since 2019. On July 1, 2019, Caroletta Segers filed an EEOC Charge of race discrimination against it. On July 23, 2020, Terrance Hurd sued it for race discrimination. Notice of Filing, Segers EEOC Charge and Hurd Complaint.

**ARGUMENT**

## I.    Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show "clearly and convincingly" the absence of any genuine issues of material fact. *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir. 1991). "When considering whether there is a genuine dispute of material fact, [the court] must believe [the plaintiff]'s evidence and draw 'all justifiable inferences . . . in his favor.'" *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644 (6th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The Court "must abstain from making credibility determinations, weighing evidence, and 'drawing of legitimate inferences' in favor of the moving party because those are 'jury functions, not those of a judge.'" *Id.* These requirements are "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993); *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 564 (6th Cir. 2003) ("[I]n discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.").

## II.    Defendant Discriminated Against Plaintiffs Because of Race

Plaintiffs may establish their Title VII, § 1981, and THRA race discrimination claims by presenting either direct or circumstantial evidence. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d

6

339, 346 (6th Cir. 2012); *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).[2] Direct evidence

is evidence which, if believed, requires a conclusion that unlawful discrimination was at least a

motivating factor in the employer's actions. *DiCarlo*, 358 F.3d at 415. If Plaintiffs provide

direct evidence, the Court need not engage in the *McDonnell-Douglas* burden-shifting analysis

used in indirect evidence cases, and summary judgment is inappropriate. *Id.* at 408.

### A.    Direct Evidence of Discrimination Precludes Summary Judgment

Plaintiffs have presented direct evidence of Defendant's discriminatory intent, which

Defendant failed to address in its motion. To survive summary judgment using direct evidence,

they must raise a disputed issue of fact as to whether Defendant was predisposed to discriminate

on the basis of race and whether it acted on that predisposition. *Id.* at 415. In *DiCarlo*, the

plaintiff alleged that the Postal Service had discriminated against him on the basis of his Italian-

American heritage, claiming that his supervisor called him a "dirty wop" and complained that

there were too many "dirty wops" working at the postal facility. *Id.* at 415-16. While the

supervisor denied making the comments, the court found that the comments and three-week

temporal proximity between them and the plaintiff's termination was sufficient to establish an

issue of fact as to whether the employer was predisposed to discriminate and acted on that

predisposition. *Id.* at 415-17.

Here, Plaintiffs' supervisors, including Driver Manager/Dispatcher Jermaine Davis and

Davis' supervisor, Caucasian Operations Manager Jordan Claytor, repeatedly used the term

"monkey ass" when referring to Plaintiffs. Smith Dep. at 46-47, 54, 56, 95; Sneed Dep. at 153-

55; Wright Dep. at 14-15. Additionally, Davis and Claytor spoke to Plaintiffs and other African

---

[2] The standards for evaluating Plaintiffs' claims under § 1981 and the THRA are the same as under Title VII. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, n. 5 (6th Cir. 2000), *reh'g and cert. denied*; *Chattman v. Toho Tenax Amer., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012).

American drivers in an extremely hostile and abusive manner. Specifically, Davis and Claytor cussed, screamed, criticized, belittled, talked down to, and threatened Plaintiffs and other African American drivers with discipline and discharge. Plaintiffs noticed that they did not treat Defendant's non-African American drivers this way. Smith Dep. at 53-56, 76, 78; Sneed Dep. at 125-26, 131-32, 152-55. Thus, in this context, Davis' and Claytor's calling Plaintiffs "monkeys" is direct evidence of discrimination. *Ash v. Tyson Foods, Inc*., 546 U.S. 454, 456 (2006) (in race discrimination cases, whether a comment such as "boy" is reasonably perceived as offensive may depend on various factors including context, inflection, tone of voice, local custom, and historical usage); *Adams v. Home Depot USA, Inc*., 2007 U.S. Dist. LEXIS 103550 *43 (D. Ore. Sept. 5, 2007) (holding that "no reasonable person could doubt that the remaining three statements referring to Adams as 'Darkman' and a monkey are racial slurs and constitute direct evidence of racial discrimination.") (citing *Chuang v. Univ. of Cal. Davis, Bd. of Trs*., 225 F. 3d 1115, 1127 (9th Cir. 2000)).

Plaintiffs have raised disputed issues of fact as to whether Defendant was predisposed to discriminate on the basis of race and acted on the predisposition. A reasonable jury could conclude that Defendant discriminated against them in the terms, conditions, and privileges of employment and discharged Sneed and constructively discharged Smith because of race. *DiCarlo,* 358 F.3d at 416-18 (discriminatory "remarks constitute direct evidence of the requisite discriminatory animus."); *Chattman*, 686 F.3d at 346-47 (reversing grant of summary judgment and stating, "'racist comments' constitute direct evidence of discriminatory intent"); *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 572 (6th Cir. 2003) (en banc) ("Wexler has produced a series of statements . . . that, if believed, indicate that age was at least a motivating factor in their decision to demote him."); *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249 (6th Cir.

1995) (holding that repeated racial slurs by owners was direct evidence that plaintiff's termination may have been racially motivated); *Erwin v. Potter*, 79 Fed. Appx. 893, 897 (6th Cir. 2003) ("Racial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence."). Because Plaintiffs have produced direct evidence of discrimination, the Court need not engage in the burden-shifting analysis used in indirect evidence cases and should deny Defendant's motion.

**B.    Circumstantial Evidence of Discrimination Precludes Summary Judgment**

Even if there were not direct evidence of discrimination, Plaintiffs can establish their discrimination claims indirectly using circumstantial evidence. They may establish a prima facie case by showing that (1) they are members of a protected class; (2) they were qualified for their jobs; (3) they suffered an adverse employment action; and (4) they were replaced by individuals outside of their protected class or, alternatively, treated less favorably than similarly situated employees outside of their protected class. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). The Sixth Circuit has repeatedly "admonished that the plaintiff's burden 'at the prima facie stage is 'not onerous' and 'poses a burden easily met.''" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777 (6th Cir. 2016) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)).

Once Plaintiffs establish a prima facie case, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment actions. If it does so, the burden shifts to Plaintiffs to show pretext. *Wheat*, 785 F.3d at 240. Plaintiffs may establish pretext by showing "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler*, 317 F.3d at 576. They "need not show that all of the factors articulated by

[Defendant] are false but rather, only that some of the factors are false and a mere pretext for discrimination." *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006).

Plaintiffs' prima facie cases, along with evidence from which a jury may reject Defendant's alleged reasons for its adverse actions, is adequate to sustain a finding of liability and to defeat a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007) ("to survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale."); *Yazdian*, 793 F.3d at 651 (same). The Court "must always keep in mind that, at summary judgment, the employee 'need not prove that the [employer's] proffered rationale is pretextual, as that would be enough proof for summary judgment in favor of the [employee].' . . . Rather, the employee 'must prove only enough to create a genuine issue as to whether the rationale is pretextual.'" *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011)).

### 1. Plaintiffs have established prima facie cases

Plaintiffs are African American. Defendant does not argue that Smith was not qualified for his job. Doc. 25 at 14. It incorrectly argues that Sneed was not qualified for his, *id.*, and in so doing, improperly "conflate[s] the stages of the *McDonnell Douglas* framework" by relying on its asserted reason for discharging Sneed at the prima facie stage. *George v. Youngstown State Univ.*, 966 F.3d 446, 465 (6th Cir. 2020); *Wexler*, 317 F.3d at 574-75 ("a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a

pretext designed to mask discrimination."); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("A court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."); *Provenzano*, 663 F.3d at 814 (holding that district court incorrectly "merged its analysis of the second (nondiscriminatory justification) and third (pretext) stages . . . in its evaluation of [plaintiff]'s prima facie case" and that "[t]his was error."). In *Wexler* the court held:

> At the prima facie stage, a court should focus on a plaintiff's *objective qualifications* to determine whether he or she is qualified for the relevant job. . . . The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, *the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.*

*Wexler*, 317 F.3d at 575-76 (emphasis in original and added).

Sneed had his CDL before coming to work for Defendant, went to truck driving school, had prior experience driving trucks, and worked for Defendant as a truck driver for 14 months running more and longer routes than its non-African American drivers. Sneed Dep. at 17, Ex. 3 at 2, bullet 2. Thus, Sneed was objectively qualified for his job. *Wexler*, 317 F.3d at 575-76.

Defendant disingenuously asserts that "neither Plaintiff can show that they suffered an adverse employment action." Doc. 25 at 14. It discharged Sneed. *Id.* at 10. Further, its assigning Plaintiffs heavier workloads and requiring them to work longer days and more and longer routes than its non-African American drivers was an adverse employment action because it resulted in Plaintiffs receiving less pay per hour for their work than non-African American drivers. Smith Dep. at 33-35, 52-53, 68-69, 71-73, 76; Sneed Dep. at 90, 95-97, 123-24, 136-38, 146-47, 150.

Smith was constructively discharged by Defendant due to racial discrimination, harassment, and intolerable working conditions. Smith Dep. at 59. A constructive discharge is an adverse employment action. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001), *reh'g denied*. Its existence "depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). "To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) 'the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing the employee to quit . . . .'" *Logan*, 259 F.3d at 568-69 (quoting *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999)); *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451-52 (6th Cir. 2005) (same). Reductions in salary or "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation" are alone sufficient to establish a constructive discharge. *Logan*, 259 F.3d at 569, 572; *West v. Tyson Foods, Inc.*, 374 Fed. Appx. 624, 640 (6th Cir. 2010); *Lee v. Cleveland Clinic Found.*, 676 Fed. Appx. 488, 495-96 (6th Cir. 2017).

Smith suffered a reduction in his $180 per day salary when Defendant made him run more and longer driving routes than his non-African American colleagues, resulting in his receiving less pay per hour than those drivers. Smith Dep. at 33-35, 52-53, 68-69, 71-73, 76. Further, Smith was continuously subjected to badgering, harassment, and humiliation by his supervisors (not mere co-workers, as in *Logan* and *Lee*), including repeatedly calling him "monkey ass" and cussing, screaming, criticizing, and belittling him while not treating non-African American drivers this way. Smith Dep. at 46-47, 53-56, 76, 78, 95. The discriminatory and abusive treatment interfered with his job performance and made it more difficult for him to

perform his job. Smith Dep. at 56-59. As in *Lee*, "management failed to investigate the comments when Plaintiff informed them of such, thus unreasonably failing to respond to the [supervisor] harassment." *Lee*, 676 Fed. Appx. at 496 (citing *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 341 (6th Cir. 2008) (concluding that summary judgment was improper when the evidence showed that employer failed to investigate harassment complaints)). "Accordingly, a genuine issue of material fact remains as to whether these comments constituted harassment and humiliation strong enough to compel resignation and whether any failure to investigate contributed to a constructive discharge." *Id.*

Smith has presented evidence from which a reasonable jury could find that an employee in his position would feel compelled to resign and that his doing so was a foreseeable consequence of Defendant's conduct. A reasonable jury could conclude that the combination of continuous discriminatory acts and comments set forth above, along with Defendant's failure and refusal to take any corrective or preventative action in response to his opposition to and repeated complaints about it, caused Smith to resign. *Id.*

As to the fourth element of their prima facie cases, Defendant testified that it had "no idea" and "d[id] not know" who replaced either Plaintiff, despite that being a specifically designated topic in Plaintiffs' Rule 30(b)(6) Notice of Deposition to it. Wright Dep. 45, 55; Notice of Filing, Notice of Deposition to Defendant at 3, ¶ 21. Therefore, Plaintiffs have established their prima facie cases. Even if they were not replaced, Plaintiffs have presented evidence of disparate treatment above that is sufficient to establish the fourth element.

### 2. Smith need not show pretext and Sneed has established pretext

Smith need not show pretext because Defendant has offered no reason for the termination of his employment other than "Smith left PAM on his own accord for greener pastures," which

completely contradicts Smith's asserted reason for leaving. Doc. 25 at 14; Smith Dep. at 59. Defendant testified that Smith left in good standing. Wright Dep. at 43. As discussed above, Defendant constructively discharged Smith due to racial discrimination, harassment, intolerable working conditions, and its failure and refusal to investigate and take corrective and preventative action. Accordingly, the Court should deny Defendant's motion as to his discrimination claim.

With respect to Sneed, Defendant asserts that it discharged him because he "continued to refuse loads and/or failed to report to work." Doc. 25 at 10, 17. In its sworn interrogatory answer regarding the reason for his discharge, Defendant cited "documents previously produced as PAM000324-PAM000328." Doc. 20-1 at 11, Ans. Interrog. No. 17.

At document PAM000328, Carl Cartwright, who submitted Defendant's response to Sneed's EEOC Charge, asked Supervisor Charles Dinkins (Sneed Dep. Ex. 3 at 102) to confirm that "Mr. Sneed was terminated by Tyrone Luckett, Driver [L]iaison for PAM on 4/16/209 for failure to complete his assignments and refusal of loads given." Sneed Dep. Ex. 3 at 108, item no. 5. Dinkins responded, "That is correct." *Id.* At document PAM000325, Operations Manager Claytor stated that "Tyrone [Luckett] actually term[inat]ed" Sneed. *Id.* at 106. Defendant testified, however, that "Jermaine [Davis] made the recommendation to his supervisor," who was Claytor; that Claytor "supported that recommendation"; and that "it was ultimately Tyrone Luckett, who let [Sneed] go." Wright Dep. at 53-54, 14.

Davis and Claytor are the two supervisors who continuously subjected Plaintiffs to the discrimination, harassment, and retaliation that Plaintiffs repeatedly opposed and complained about. Thus, Defendant may be held liable under the cat's paw theory. "A plaintiff alleging liability under the cat's paw theory seeks 'to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Marshall v.*

*Rawlings Company L.L.C.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1069 (6th Cir. 2015) ("Under the cat's paw theory of liability, we focus on whether another individual and not the actual decision maker 'is the driving force behind the employment action.'"); *Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018) ("[a]n employer is also vicariously liable for retaliation that a supervisor initiates against an employee by causing another actor, that might itself lack retaliatory animus, to take an adverse action against the employee.").

At document PAM000324, Defendant's Driver Review Details for Sneed, Supervisor Dinkins documented that Sneed was a "Reliable driver, no issues to report" as of February 10, 2020. Sneed Dep. Ex. 3 at 104. On February 24, 2020, he documented that Sneed "continues to be a valuable asset to the TRR team." *Id.* On March 20, 2020, Dinkins again documented that Sneed was a "reliable driver, no issues to report." *Id.* Dinkins' notes about Sneed, including less than one month before his discharge, are consistent with Sneed's testimony that he "never had any complaints," "never had any write-ups," "never had any accidents," that "most of [his] loads got there on time," and that Defendant never formally disciplined him. Sneed Dep. at 131-32, 157-58, 160-63.

On April 7, 2020, just nine days before he and Claytor recommended that Sneed be discharged, Davis noted alleged instances of Sneed allegedly failing to pick up loads and advising Davis that he was too tired to make two trips to Horse Cave, Kentucky, and back. Sneed Dep. Ex. 3 at 104. On April 16, 2020, the same day that Defendant discharged Sneed, Davis noted that Sneed allegedly refused loads. *Id.* Davis' notes contradict Dinkins' and Sneed's testimony. The evidence suggests that Sneed's performance was not as dismal as Davis made it appear just days before his discharge. *Id.*

Defendant's alleged reasons for discharging Sneed without any formal write ups consistent with its progressive discipline policy and practice are pretexts. Sneed testified, "I never been wrote up. I don't have no problems. I do my job." Sneed Dep. at 158. As discussed above he did complain when Defendant overloaded him with work and made him run more and longer routes than its non-African American drivers. *Id.* Sneed further testified that he never picked up a load and failed to deliver it; never missed a delivery deadline through any fault of his own; never refused to clean out a trailer; never went home or left work without telling anyone; was not counseled about spending too long at truck stops; and did not recall ever failing to respond to a communication from his supervisor. Sneed Dep. at 160-63. From this evidence a reasonable jury could conclude that Defendant's alleged reason for discharging Sneed was a pretext. Davis' and Claytor's discriminatory statements to Plaintiffs are also evidence of pretext. *Hannon v. Louisiana-Pacific Corp.*, 784 Fed. Appx. 444, 450 (6th Cir. 2019); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009); *Vincent v. Brewer Co.*, 514 F.3d 489, 498 (6th Cir. 2007). Accordingly, the Court should deny Defendant's motion as to Plaintiffs' discrimination claims.

### III.     Defendant Subjected Plaintiffs to a Racially Hostile Work Environment

Defendant further discriminated against Plaintiffs by creating and maintaining a racially hostile or abusive work environment. Plaintiffs may establish liability by showing that (1) they are members of a protected class; (2) they were subjected to unwelcome harassment; (3) the harassment complained of was based on their protected status; (4) the harassment created a hostile work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). The conduct complained of "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v.*

*Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993). It must be both objectively and subjectively offensive. *Id.* at 21-22.

"In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment . . . the court must consider the totality of circumstances." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561-62 (6th Cir. 1999). "[T]he totality-of-the-circumstances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment . . . [and] includes all incidents of alleged harassment." *Id.* at 562-63. "[E]ven where individual instances of … harassment do not on their own create a hostile work environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.* at 563. Further, "'[T]he plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job.'" *Id.* at 567 (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)).

A hostile work environment may be established by a single event if that event is "extremely serious" or severe enough. *Harris*, 510 U.S. at 21; *Williams v. CSX Transp. Co.*, 643 F.3d 502, 512 (6th Cir. 2011). Courts have repeatedly held that even one or a few uses of a slur in the workplace is sufficient to withstand summary judgment. *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993); *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1254 (11th Cir. 2014); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013); *Castleberry v. STI Group*, 863 F.3d 259 (3d Cir. 2017); *Johnson v. United Parcel Serv., Inc.*, 117 Fed. Appx. 444, 454 (6th Cir. 2004); *Chattman*, 686 F.3d at 346. "[W]hether harassment is sufficiently severe or pervasive to establish a hostile work environment is '*quintessentially a question of fact*.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (emphasis added).

As to liability, "'[A]n employer *is* vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Clark v. UPS*, 400 F.3d 341, 348 (6th Cir. 2005) (emphasis in original) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999)). Where "the victim did suffer some tangible employment action, such as a demotion, discharge, or undesirable transfer, then liability is automatic and the employer does not have the benefit of the affirmative defense." *Id.* at n. 1 (citing *Williams*, 187 F.3d at 561).

Plaintiffs are members of a protected class. A reasonable jury could find that they were subjected to unwelcome harassment; that the harassment was based on race and created a hostile work environment; and that Defendant is liable based on Plaintiffs' supervisors' discriminatory and abusive comments and conduct. As discussed above, throughout Plaintiffs' employment, Davis and Claytor subjected them to continuous acts of racially disparate treatment that caused them to earn less per hour than their non-African American counterparts. Moreover, they repeatedly used the term "monkey ass" when referring to Plaintiffs. Smith Dep. at 46-47, 54, 56, 95; Sneed Dep. at 153-55. Further, Davis and Claytor spoke to Plaintiffs and other African American drivers in a hostile and abusive manner. They cussed, screamed, criticized, belittled, talked down to, and threatened Plaintiffs and other African American drivers, despite their repeated objections and complaints about it. Plaintiffs noticed that they did not treat non-African American drivers this way. Smith Dep. at 53-56, 76, 78; Sneed Dep. at 125-26, 131-32, 152-55. Defendant's discriminatory and abusive treatment of Plaintiffs interfered with their job performance and made it more difficult for them to perform their jobs. Smith Dep. at 56-59; Sneed Dep. at 132-35. From this evidence a reasonable jury could find that Plaintiffs were subjected to a racially hostile or abusive work environment. *Fite v. Comtide Nashville, LLC*, 686

F. Supp. 2d 735, 751-52 (M.D. Tenn. 2010).

Contrary to Defendant's argument, it cannot avail itself of the *Faragher/Ellerth* affirmative defense in this case. Doc. 25 at 19. Employers are vicariously liable for the actions of their supervisors. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-808 (1998). Sneed and Smith suffered tangible employment actions when they were actually and constructively discharged, respectively, following the racial harassment to which they were subjected and repeatedly complained about. Thus, no affirmative defense is available. *Clark v. UPS*, 400 F.3d at 348, n. 1.

Even if they had not suffered tangible employment actions, Defendant would only be entitled to assert the affirmative defense it if it could establish: (1) that it exercised reasonable care to prevent and correct promptly Plaintiffs' supervisors' racial harassment and (2) that Plaintiffs unreasonably failed to take advantage of any preventative or corrective opportunities it provided. *Ellerth*, 524 U.S. at 765. Defendant cannot prove either, let alone both, elements.

First, Defendant did not exercise reasonable care to prevent and promptly correct the discriminatory conduct Plaintiffs reported to it. While it had an anti-harassment policy, it did not "effectively implement" that policy. *Clark*, 400 F.3d at 349-50. It did nothing to "prevent or correct promptly" the harassment Plaintiffs reported and conducted no investigation. As a result, the discrimination and harassment continued. Smith Dep. at 77-78; Sneed Dep. at 108-09, 116, 119, 142, 156-57, 171-72, 176-77; Wright Dep. at 36, 50. "Thus, whether [Defendant] . . . exercised reasonable care is a question for a factfinder." *Clark*, 400 F.3d at 350.

Second, Defendant's driver manual and anti-harassment policy permitted Plaintiffs to report discrimination and harassment to any manager. Wright Dep. at 25, 35; Sneed Dep. Ex. 3 at 49, 53. As discussed above, Plaintiffs repeatedly opposed and reported Davis' and Claytor's

discriminatory comments and racially disparate treatment of them to other managers, including James Brown, Tyrone Luckett, Keith Coatney, and Fred Meek. Defendant disingenuously attempts to argue that "Mr. Brown did not have any supervisory or management authority." Doc. 25 at 9. The record contradicts its assertion. Like Luckett, Brown was a Driver Liaison. Wright Dep. at 59-60, 62. Unlike Driver Managers, Driver Liaisons had the authority to terminate drivers' employment. Wright Dep. at 14. Indeed, Luckett made the decision to terminate Sneed's employment. Wright Dep. at 53-54; Sneed Dep. Ex. 3 at 106, 108. Therefore, Brown did have management authority. Furthermore, "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—*or is reasonably believed by a complaining employee to have been authorized*—to receive and respond to or forward such complaints to management." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 277 (6th Cir. 2009) (emphasis added). Thus, Plaintiffs did not unreasonably fail to follow Defendant's policy and it is not shielded from liability. Accordingly, the Court should deny Defendant's motion as to Plaintiffs' hostile work environment claims.

## IV. Defendant Retaliated Against Plaintiffs for Opposing and Reporting Discrimination

Plaintiffs may establish a *prima facie* case of retaliation by showing that (1) they engaged in protected activity; (2) their exercise of protected rights was known to Defendant; (3) Defendant thereafter took an adverse employment action against them, or subjected him to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse action or harassment. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000), *reh'g denied*. As with discrimination claims, "'The burden of establishing a *prima facie* case of retaliation is not onerous, but one easily met.'" *DiCarlo*, 358 F.3d at 420 (citation omitted); *Yazdian*, 793 F.3d at 649. Once Plaintiffs

make the *prima facie* showing, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its adverse action. If it does so, the burden shifts to Plaintiffs to show pretext. *Id*.

Plaintiffs engaged in protected activity when they continuously opposed Davis' and Claytor's discriminatory comments and treatment of them throughout their employment. Sneed Dep. at 110-11; Smith Dep. at 45-46, 69-70, 76-77, 171-72. They repeatedly reported and complained about Davis' and Claytor's discriminatory comments and racially disparate treatment of them to other managers, including James Brown, Tyrone Luckett, Keith Coatney, and Fred Meek. Smith Dep. at 45-47, 76-77; Sneed Dep. at 104-111, 117, 174-77, 181; Wright Dep. at 14-15, 59-63. Plaintiffs reported that they and other African American drivers were being assigned heavier workloads and having to work longer days and drive more routes than their non-African American counterparts, resulting in their receiving less pay per hour for their work. They complained "on numerous occasions" and "several times" about the fact that the routes they were assigned were longer and took more time to complete than those that Defendant assigned to non-African American drivers. Smith Dep. 46-48, 69-70, 72-74; Sneed Dep. at 95-98, 104-05, 108-09, 115, 117, 136-37, 148, 150. Plaintiffs complained about the fact that Davis and Claytor were using racially derogatory terms to and about them and other African American drivers, including "monkey ass," and belittling and mistreating them. Smith Dep. at 46-47; 153-55. They complained that they were being assigned older and less desirable trucks than the non-African American drivers. Smith Dep. at 64; Sneed Dep. at 148-49. They complained about the fact that they did not receive job training equal to that which non-African American drivers received. Smith Dep. at 26-27, 59-62; Sneed Dep. at 137-42. Thus, Plaintiffs engaged in protected activity known to Defendant.

As to the adverse action element, in addition to subjecting them to disparate treatment that directly impacted their income, Defendant constructively discharged Smith and discharged Sneed shortly after they engaged in protected opposition and reporting activity.

As to causation, the close temporal proximity between Plaintiffs' continuous opposition and reporting activity and their actual and constructive discharges is alone sufficient to establish this element. *Singfield*, 389 F.3d at 563 (holding time span of "just over three months" between protected activity and discharge sufficiently close in time to establish causation); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (same); *Asmo*, 471 F.3d at 593-94 (6th Cir. 2006) (two months sufficient); *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776-77 (6th Cir. 2018) (same). Further, as discussed above, Plaintiffs have also presented evidence of disparate treatment, threats of discipline and discharge, and supervisory hostility and abuse that continued even after they reported it. This is sufficient to establish causation. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 615 (6th Cir. 2019). "Other evidence supporting a causal link 'has commonly included evidence of additional discrimination occurring between the date at which the employer learned of the protected activity and the date of termination or other adverse employment action.'" *Barrow v. City of Cleveland*, 773 Fed. Appx. 254, 264 (6th Cir. 2019) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). A plaintiff's being subject to "increased scrutiny of his work before he was terminated" or "verbal threats" or being treated "with exceptional harshness" after engaging in protected activity can establish causation. *Id.* (quoting *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007); and *Brown v. Lexington-Fayette Urban Cty. Gov't*, 483 F. Appx. 221, 227 (6th Cir. 2012)).

Finally, as shown in Argument Section II(B) above, a reasonable jury could find that Defendant constructively discharged Smith, and Sneed has presented evidence sufficient to create a genuine issue of material fact as to whether Defendant's asserted reason for discharging him is pretextual. Sneed testified that Defendant's alleged reasons for discharging him are false and that he did not engage in the conduct of which Defendant accuses him. Sneed Dep. at 131-32, 157-58, 160-63. Defendant has very little if any contemporaneous documentation supporting its alleged reasons. The QualComm messages it produced and references are incomplete and indecipherable. Plaintiffs have issued subpoenas to Qualcomm and to Omnitracs and are awaiting complete and legible copies of all Qualcomm messages they sent and received during their employment with Defendant from Omnitracs. Notice of Filing, May 27 and 31, 2022, emails with Omnitracs' counsel.

Moreover, Supervisor Dinkins documented as late as March 20, 2020, that Sneed continued to be a "reliable driver" and that there were "no issues to report" with respect to him or his performance. Sneed Dep. Ex. 3 at 104. After Sneed opposed and reported Davis' and Claytor's discriminatory comments and conduct to several managers, Davis suddenly documented alleged deficiencies in his performance on April 7 and 16, 2020. *Id.* This was nine days before and on the date of Sneed's discharge, respectively. It also blatantly contradicted Dinkins' written assessments of Sneed's performance in February and March 2020. *Id.*

Dinkins' and Davis' strikingly inconsistent assessments of Sneed's job performance are suspicious and establish a genuine issue of material fact as to whether his performance "actually motivated" his discharge, or whether Davis and Claytor retaliated against him for opposing and reporting their discriminatory conduct. From this evidence a reasonable jury could find pretext. Accordingly, the Court should deny Defendant's motion as to Plaintiffs' retaliation claims.

## CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that the Court deny Defendant's motion for summary judgment.

Respectfully submitted,

s/Stephen W. Grace
Stephen W. Grace, (TN BPR No. 14867)
1019 16th Avenue, South
Nashville, Tennessee  37212
(615) 255-5225

s/Douglas B. Janney III
Douglas B. Janney III (TN BPR No. 19112)
2002 Richard Jones Road, Suite B-200
Nashville, Tennessee 37215
(615) 742-5900

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that I electronically filed and served this Response in Opposition to Motion for Summary Judgment using the Court's CM/ECF system upon M. Reid Estes, Jr., and Autumn L. Gentry, Dickinson Wright PLLC, 424 Church Street, Suite 800, Nashville, Tennessee 37219 on June 6, 2022.

s/Douglas B. Janney III
Douglas B. Janney III