IN THE UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| THOMAS MICHAEL SMITH and MONALETO SNEED, | ) ) | |
| | ) | NO. 3:21-cv-00262 |
| Plaintiffs, | ) ) | |
| | ) | JUDGE RICHARDSON |
| v. | ) ) | |
| P.A.M. TRANSPORT, INC., | ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Pending before the Court is Defendant's motion for summary judgment and for attorney's fees and costs (Doc. No. 24, "Motion"). Defendant filed a memorandum in support of the Motion (Doc. No. 25, "Memorandum") and a statement of material facts (Doc. No. 26, "Defendant's Statement of Facts"). Plaintiffs filed a response in opposition to the Motion (Doc. No. 31, "Response"), and a separate response to Defendant's Statement of Facts (Doc. No. 32, "Plaintiffs' Response to Defendant's Statement of Facts and Additional Facts"). Defendant then filed a reply to Plaintiffs' Response (Doc. No. 39, "Reply"), as well as a response to Plaintiffs' Response to Defendant's Statement of Facts and Additional Facts (Doc. No. 37, "Defendant's Response to Plaintiffs' Additional Facts").

For the reasons discussed herein, the Court will grant in part and deny in part Defendant's Motion. Specifically, the Court will grant the motion as to summary judgment but will deny the motion without prejudice as to the request for attorney's fees and costs.

I.       Plaintiffs' Employment With Defendant

Defendant is a transportation company employing over 2,400 truck drivers, each of which drives either over-the-road or local routes.[2] (Doc. No. 32 at 5). Both of the Plaintiffs, Monaleto Sneed ("Sneed") and Thomas Michael Smith ("Smith"), are African Americans who were employed by Defendant as drivers dispatched out of Defendant's Nashville Whites Creek location. (Doc. Nos. 32-5 at 4; 33-1 at 31-32; 33-4 at 11). Sneed was hired by Defendant on February 8,

---

[1] The facts that are stated herein without qualification are undisputed—a term the Court will use to describe both facts that are not in dispute *at all* and facts that are not in *genuine* dispute—and are treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiffs contend that") are in dispute and are treated as such. Some of the facts herein come from Plaintiffs' Response to Defendant's Statement of Facts and Additional Facts (Doc. No. 32), wherein they are not disputed by Plaintiffs in response to Defendant's assertion of them. Other facts come from Defendant's Response to Plaintiffs' Additional Statement of Material Facts. (Doc. No. 37). In Defendant's Response to Plaintiffs' Additional Facts, Defendant argues that the Court should strike the additional statements of fact included in Plaintiffs' Response to Defendant's Statement of Facts and Additional Facts because (according to Defendant) they are not actually "additional" disputed material facts. Rather (according to Defendant), Plaintiffs' purported "additional facts" are "simply duplicative" of what is included in Plaintiffs' responses to Defendant's Statement of Facts. Defendant asserts that this violates L.R. 56.01(c)(3). The Court presently declines to disregard Plaintiffs' additional statement of facts due to non-compliance with the Local Rules, but Plaintiffs' counsel is encouraged to ensure strict compliance in future filings lest this Court (or another) be less forgiving.

   Other facts contained herein come from Smith and Sneed's depositions and are cited (as being accurate) by Defendant in its briefing. Other facts (background, uncontroversial ones) are mutually stated in the parties' opposing briefing. Still more facts come from the deposition testimony of an employee of Defendant and are cited (as being accurate) by Plaintiff.

   Moreover, as discussed elsewhere, the Court treats certain facts as undisputed because Plaintiffs have cited only their own deposition testimony to deny those facts, and Plaintiffs' deposition testimony does not adequately show that they have personal knowledge to support certain assertions made therein.

   There are other purported facts that are disputed but are evidentially supported and are asserted by Plaintiffs and Defendant, respectively, to support their respective views that there is (according to Plaintiffs) or is not (according to Defendant) a genuine issue of material fact as to a particular claim. The Court refers to these purported facts, and the evidence supporting them, in appropriate places in its analysis below.

[2] "Over-the-road" drivers spend weeks (or sometimes months) at a time on the road and are assigned trucks with sleeper berths. (Doc. No. 25-2 at ¶ 9). "Local" drivers, by contrast, drive only local routes and return home at the end of each workday. (*Id.*).

2019 as an over-the-road driver.[3] (Doc. No. 32 at 2). Sneed worked for Defendant as an over-the-road driver for just two months before he was transferred (upon his request) to a local driver position with Defendant on April 10, 2019.[4] (*Id*. at 2-3). Sneed then worked for Defendant as a local driver until he was terminated on April 16, 2020. (*Id*.).

Smith was hired by Defendant as a local driver on October 24, 2018. (*Id*. at 3). At the time he was hired by Defendant, Smith already possessed a CDL and approximately 19 years of truck-driving experience. (*Id*. at 8). Smith resigned from Defendant after nearly six months on April 23, 2019. (*Id*. at 3). At the time that he resigned, he had already accepted a job at another trucking company. (*Id*. at 5).[5]

As noted above, Plaintiffs operated out of Defendant's Whites Creek location. (*Id*. at 4). During Plaintiffs' employment with Defendant, the racial composition of the driving force at the Whites Creek location was split approximately evenly between whites and minorities. (*Id*. at 6).[6] Plaintiffs reported to Jermaine Davis ("Davis"),[7] who, like Plaintiffs, is African American. (*Id*. at

---

[3] Sneed earned his commercial driver's license (CDL) prior to joining Defendant. (Doc. No. 33-2 at 17).

[4] Sneed's "transfer" relates only to his change of position from an over-the-road driver to a local driver. He worked out of the Whites Creek location at all times during his employment with Defendant.

[5] Smith now drives locally for another trucking company—a different company than the one he worked for immediately after resigning from Defendant—where he earns $65,000 per year. (*Id*. at 5). This salary is more than 40 percent above what he earned in his position with Defendant. (*Id*.).

[6] Plaintiffs dispute this fact, but the basis they provide to support their disagreement does not actually serve to refute this fact. (*See* Doc. No. 33-1 at 25-26; Doc. No. 33-4 at 12, 44; Doc. No. 33-2 at 66-68). Accordingly, the Court accepts this fact as true.

[7] While it is undisputed that Plaintiffs reported at least to Davis, the parties dispute whether Plaintiffs also reported to individuals other than Davis. Plaintiffs maintain that they reported also to "Davis' [sic] predecessor" (who is unnamed), Operations Manager Jordan Claytor ("Claytor"), and Supervisor Charles Dinkins ("Dinkins"). (Doc. No. 32 at 3). Defendants dispute this. However, Defendant acknowledges that Plaintiffs would have "interacted" with driver managers (i.e., "dispatchers") other than Davis. (Doc. No. 33-4 at 15-16). The parties do not explain the distinction between "interact[ing]" with and "report[ing]" to a particular individual.

3-4). As a driver manager,[8] Davis was responsible for assigning Plaintiffs their routes,[9] number of loads, and the trucks they drove. (*Id.*).

Plaintiffs, along with most of the other Whites Creek local drivers, were designated as Texas Regional Relay ("TRR") drivers.[10] (*Id.* at 4). TRR drivers are paid a daily rate. (*Id.*) Other than two shuttle drivers who were paid hourly, and one driver who pulled only one TRR load for which he was paid by the mile, all but two Whites Creek TRR drivers (including Plaintiffs) were paid at the same rate, i.e. a daily rate of $180 per day. (*Id.* at 13).[11] The remaining two TRR drivers (one white and one African American) were paid at a rate of $170 per day. (*Id.*).[12]

During Plaintiffs' employment, Defendant provided training in a group setting to all of its newly hired (but experienced) drivers who already held CDLs. (*Id.* at 8).[13] According to Defendant,

---

[8] Davis's position ("Driver Manager") is also referred to by both parties as "dispatcher."

[9] Plaintiffs do not deny this, but they assert that Claytor and "another driver manager" also assigned routes to Plaintiffs (Doc. No. 32 at 3-4).

[10] "TRR" is a relay network created specifically to transport freight from Laredo, Texas to various points in the U.S. (and back) utilizing a network of day-cab trucks. (*Id.*). Herein, the Court uses "drivers" (unless otherwise specified) to mean local, TRR drivers.

[11] Plaintiffs do not dispute this fact, but they do maintain that Defendant assigned African American drivers more loads and longer trips, causing Plaintiffs (and other African American drivers) to earn less per hour than white drivers. (*Id.*). But Plaintiffs have cited only their own deposition testimony to support this assertion, and for reasons stated in the analysis below, Plaintiffs' deposition testimony does not adequately show that they have personal knowledge to support this assertion.

[12] Defendant does not explain why there were these outliers, i.e., two drivers who received only $170 per day, as opposed to the $180 per-day rate that the other TRR drivers received.

[13] Although Plaintiffs do not dispute that they received training, Plaintiffs dispute that the training provided was uniform because (according to Plaintiffs) non-African American employees received more time from trainers than did African American employees. (*See* Doc. No. 32 at 8-9). But Plaintiffs have cited only their own deposition testimony to support this assertion, and for reasons stated in the analysis below, that deposition testimony does not adequately show that they have personal knowledge to support this assertion.

this training consisted of an approximately three-day in-person group orientation at one of Defendant's orientation centers (located at either its headquarters or another location). (*Id*. at 9).

While employed, Plaintiffs also received training covering Federal Motor Carrier Regulations and Defendant's policies and procedures. (*Id*.). Following the training, the new hires were required to take and pass written tests and a road test. (*Id*.). Additionally, the new hires received instruction on utilizing a Qualcomm messaging system that was present in each truck. (*Id*.). The Qualcomm system enables communication between a driver and his or her manager or dispatcher regarding route/load assignments, truck allocations, and any arising issues, including employment-related concerns. (*Id*. at 10).

In addition to providing training, Defendant furnished each driver with a driver manual, which contained Defendant's Anti-Discrimination and Harassment Policy ("Anti-Discrimination Policy"). (Doc. No. 32 at 6). The Anti-Discrimination Policy advises drivers to report any harassment to "a Supervisor, Driver/Fleet Manager, or HR." (Doc. No. 33-3 at 53). The driver manual that Plaintiffs received also included Defendant's Open Door Communications Policy ("Open Door Policy") (collectively, with the Anti-Discrimination Policy, "Policies") which encourages all employees to discuss "any matter openly or in confidence and without fear of retaliation." (*Id*. at 54). The Open Door Policy instructs employees to "first exercise this right with [their respective] immediate supervisor, and, if necessary, to succeeding levels of management up to and including the Company's president." (*Id*.).

Plaintiffs were assigned various company-owned trucks during their employment. (Doc. No. 32 at 10). During their depositions, neither Plaintiff could recall the model year of the truck(s) they drove while working for Defendant. (*Id*.). Defendant's records show that during the time of Plaintiffs' employment, local drivers at Defendant's Whites Creek location almost always drove

2018 Peterbilt trucks. (Doc. Nos. 25-3, 25-4).[14] According to Defendant's records, only two 2019 Peterbilt trucks were driven (for a total of seven days) during Plaintiffs' employment, and neither one was driven by a white employee. (Doc. Nos. 25-3, 25-4). Moreover, Defendant's records show that three 2017 International trucks were used (for a total of 44 days by six drivers). (Doc. Nos. 25-3, 25-4). But according to Defendant's records, Sneed was never assigned a 2017 truck, and Smith was assigned a 2017 truck only once and drove it only a single day. (Doc. Nos. 25-3, 25-4).[15]

Although Smith was not employed by Defendant long enough to accrue any vacation time, Sneed accrued five days of vacation time. (Doc. No. 32 at 11-12). Instead of using his vacation time off, Sneed requested that it be paid out on his paycheck and received such payment on March 12, 2020.[16] (Id. at 12).

Drivers at the Whites Creek location were not required to work Saturdays but could do so on a voluntary basis.[17] (Doc. No. 25-2 at 6). Sneed requested to work on multiple Saturdays, (see

---

[14] In his deposition, Sneed stated that he has no reason to disagree with Defendant's records insofar as they show that he drove a 2018 Peterbilt truck. (Doc. No. 33-2 at 75-76). Nevertheless, Plaintiffs maintain (without support beyond their own testimony to the contrary) that they were assigned older, less desirable trucks than their non-African American counterparts.

[15] According to Defendant's records, besides being driven one day by Smith and one day by an Iraqi driver, 2017 trucks were assigned only to white drivers (four of them total) during Plaintiffs' employment.
   The Court notes that although the parties do not so state, truck assignments were at least generally done by the day rather than, for example, by the trip or by the week.

[16] One might wonder why an employee would elect to be paid out for his accrued vacation time without actually enjoying that vacation time by taking the time off (while also getting paid for it). Without purporting to know Sneed's reasons for making such a request, the Court notes that one reason an employee might wish to do so would be to collect additional wages (paid vacation time) with one's standard wages in the immediate pay period, rather than waiting to collect the paid vacation time wages only after the vacation time is used. Whatever Sneed's motivations might be, Plaintiffs do not dispute that he requested that his accrued vacation time be paid out on his paycheck and received such payment on March 12, 2020.

[17] Plaintiffs dispute the fact that drivers at the Whites Creek location who worked on Saturdays did so on a purely voluntary basis, but their only basis for their dispute is Sneed's testimony stating that (i) that he

Doc. No. 25-6), and out of the approximately 52 weeks he worked as a local driver, Sneed worked eight Saturdays. (Doc. No. 32 at 13).

## II. Plaintiffs' Claims and Facts Giving Rise to Those Claims

Each Plaintiff brings three types of claims: race-discrimination, retaliation, and hostile work environment, although in doing so they each (for whatever reason) invoke only a statute (or statutes) that the other does not invoke.[18] (Doc. No. 1). Specifically, Sneed brings his claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the Tennessee Human Rights Act, Tenn. Code Ann. 4-21-101, *et seq.* ("THRA"),[19] whereas Plaintiff Smith brings his claims under § 1981. But courts use the same framework for analyzing each of the three types of Plaintiffs' claims, regardless of the statute under which the type of claim is brought. So with respect to each Plaintiff, the Court need conduct only one analysis of each type of claim, regardless of the statute under which the type of claim is brought. *Frazier v. Phillip's Masonry Grp., Inc.*, No. 1:09-0022, 2010 WL 1882123, at *6 & n.2

---

never saw any of the white drivers working on the Saturdays that he worked, and (ii) white employees told him that they did not work Saturdays. (Doc. No. 33-2 at 129). Because Sneed's testimony lacks a basis for personal knowledge and relies on hearsay, the Court accepts this fact as true.

[18] Plaintiffs do not designate each claim as a separate "count" in the Complaint. Rather, Plaintiffs simply allege (in consecutive paragraphs of the Complaint) that Defendant's conduct as it is described in the Complaint gives rise to claims that Defendant discriminated against them, retaliated against them, and created a hostile work environment. (*Id*. at ¶¶ 22-24).

[19] The THRA prohibits discrimination by an employer based upon certain protected categories, including race, (Tenn. Code Ann. § 4-21-401(a)), and prohibits retaliation against a person who opposes a practice declared discriminatory by the THRA. Tenn. Code Ann. § 4-21-301(a). Though the THRA is a state discrimination law, courts apply the same principles as they would to a claim brought under Title VII or 42 U.S.C. § 1981. *See e.g., Campbell v. Fla. Steel Corp*., 919 S.W.2d 26, 31 (Tenn. 1996) ("The stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act." (internal citations omitted)). It is true that the THRA is broader than Title VII in some respects, *Walton v. Interstate Warehousing, Inc*., No. 3:17-cv-1324, 2020 WL 1640440, at *5 (M.D. Tenn. Apr. 2, 2020), but not any that are relevant to the analysis in this case.

(M.D. Tenn. May 11, 2010) ("THRA claims are also analyzed under Title VII law" (citing *Madden v. Chattanooga City Wide Serv. Dept.,* 549 F.3d 666, 673 (6th Cir. 2008))); *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc*., No. 3:14 C F02325, 2016 WL 2927983, at **3, 8, 10 (M.D. Tenn. May 19, 2016) ("Plaintiff brings his race discrimination claim under Title VII, § 1981, and the THRA, yet we need only conduct one analysis." (citing multiple Sixth Circuit cases)).

Plaintiffs rely on the same set of allegations to support their claims of race discrimination, retaliation, and hostile work environment. That is to say, the same facts that Plaintiffs allege form the basis of their race-discrimination claims also form the basis of their claims of retaliation and hostile work environment. Specifically, Plaintiffs assert that Davis and Claytor cussed, screamed, criticized, and belittled them and other African American drivers by, for example, their tone of voice and making comments questioning Plaintiffs' productivity. (Doc. No. 31 at 2). Additionally, Plaintiffs claim that Davis and Claytor used the term "monkey ass" when referring to Plaintiffs.[20] (*Id*.). Plaintiffs also maintain (despite Defendant's records to the contrary) that, as compared to "white" drivers, Plaintiffs were paid less for completing the same or more work, were assigned less desirable (i.e., longer) driving routes, and were assigned "older, damaged, and less desirable trucks." (*Id*.). Plaintiffs also claim that Defendant spent more time training non-African American employees.[21] (*Id*. at 4).

---

[20] Neither Plaintiff offered details such as when he was called "monkey ass," how frequently it occurred (except by suggesting that it occurred at least more than once), or who else would have known that it occurred. Nor does either Plaintiff point to any evidence indicating that non-African Americans were not likewise called "monkey ass" by Davis and Claytor.

[21] Specifically, Sneed testified that he "felt" that the trainer would favor white employees and spend more time with them than African American employees during the training all employees received. (Doc. No. 33-2 at 138-40). Smith, on the other hand, testified that he was given only one day of training on the road, whereas non-African American drivers that came after him (according to Smith) received "a couple days" of training. (Doc. No. 33-1 at 59-60). Smith admitted that he did not know how much experience the drivers who came after him had or whether they already had a CDL. (*Id*.).

Plaintiffs also contend that they complained on multiple occasions about Defendant's conduct to managers—including James Brown ("Brown"), Tyrone Luckett ("Luckett"), Keith Coatney ("Coatney"), and Fred Meek ("Meek")—and that Defendant failed to take any action to address these alleged complaints.[22] (*Id*. at 3-4). Plaintiffs assert that the discrimination and harassment continued despite their complaints. (*Id*.). To support the above-referenced claims, Plaintiffs rely solely on their own deposition testimony, much of which (as explained in the analysis below) is based on hearsay and/or is offered without an adequate basis to establish personal knowledge to support a particular assertion.

Defendant seeks to refute Plaintiffs' allegations by relying on contradictions within Plaintiffs' own testimony, on the deposition (Doc. No. 33-4) and declaration (Doc. No. 25-2) of Defendant's Director of HR Administration, Holly Wright ("Wright"), and on various documents including records of Qualcomm messages between Plaintiffs and supervisors, route records, and truck assignment records (Doc. Nos. 25-3, 25-4, 25-5, 25-6, 25-7).

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms,

---

[22] Though Plaintiffs assert in their Response that they complained to Brown, Luckett, Meek, and Coatney about the discriminatory harassment to which they were allegedly subjected, Plaintiffs' citations in support of this assertion actually fail to support it, particularly with respect to Smith. Indeed, Smith testified that he complained only to Brown, (Doc. No. 33-1 at 49), and that he never recalled communicating with Luckett in particular. (*Id*. at 45).

Sneed, on the other hand, testified that he complained to Davis, Claytor, and Luckett about the alleged discrimination via Qualcomm. (Doc. No. 33-2 at 95-98, 103-04, 108). But the record of Qualcomm messages produced by Defendant supports no such thing. Moreover, for reasons discussed below, the undersigned rejects (as did the magistrate judge) Plaintiffs' assertion that the Qualcomm records produced by Defendant are incomplete.

Sneed also testified that he communicated with Meek at one point but could not recall what about. (Doc. No. 33-2 at 113). He also testified that he complained to Coatney about the discrimination he allegedly faced. (*Id*. at 174-77). Sneed does not specify the manner in which he communicated with Coatney and Meek, or when exactly he communicated with either of them.

this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. United Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "showing"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support" a material fact (for example, the existence of an element of a nonmovant plaintiff's claim). Fed R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[23] Importantly, "[s]ummary judgment

---

[23] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to a fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed—i.e., any party seeking summary judgment and any party opposing summary judgment, respectively—can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

A defendant-movant cannot meet its initial burden on motion for summary judgment merely by *claiming* that the plaintiff lacks evidence and essentially challenging the plaintiff to show otherwise; a defendant-movant must—by pointing to materials of record or otherwise—*show* (subject to the plaintiff's subsequent opportunity to show otherwise) that the plaintiff could not prove his claim by a preponderance. *See* Fed. R. Civ. P. 56(c)(1).[24] In other words, the defendant-movant must produce evidence *tending to show* (though not necessarily *conclusively showing*) that the plaintiff cannot raise a genuine issue as to any material fact.[25] *Nickols v. Morris*, 705 F. Supp. 2d 579, 584–85 (N.D. Tex. 2010) ("The party moving for summary judgment has the initial burden of informing the Court of the basis for his motion and producing evidence which tends to show that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter of law."), *aff'd*, 419 F. App'x 534 (5th Cir. 2011).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must

---

[24] The Court rejects cases that have indicated otherwise. *See, e.g., O.M.A., S.r.l. v. Simon DeYoung Corp.*, No. 1:10-CV-0861, 2013 WL 7210503, at *3 (N.D. Ohio Mar. 12, 2013) ("[A summary judgment] movant in federal court is not required to . . . provide evidence to show that his opponent has no evidence"), *report and recommendation adopted in part, rejected in part on other grounds*, No. 1:10 CV 00861, 2014 WL 587171 (N.D. Ohio Feb. 14, 2014); *Goldcorp, Inc. v. United States*, No. 00-75043, 2002 WL 551042, at *6 (E.D. Mich. Mar. 27, 2002) ("At any rate, even if [the] affidavit were altogether stricken from the record, it appears that the Government still would be entitled to summary judgment in its favor. After all, this affidavit has been provided merely to prove a negative: namely, that there is no evidence that the IRS ever received the protective claim allegedly sent by Plaintiff on or before September 15, 1995. Presumably, then, the Government could have simply asserted this proposition in its brief and left it to Plaintiff to introduce evidence calling this issue into question.").

[25] Notably, a defendant-movant typically can show that there is no genuine issue as to any material fact by showing that there is no genuine issue as to the existence of a fact (usually, the element of a claim) that absolutely needs to exist for the plaintiff to prevail. If the defendant-movant can make this showing, all other facts become immaterial (because the plaintiff necessarily will suffer summary judgment anyway), and thus it can be said that the plaintiff (being unable to show a genuine issue as to *one* material fact) cannot raise a genuine issue as to *any* material fact.

show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

Below, the Court addresses in greater detail the legal framework applicable to Title VII claims, § 1981 claims, and THRA claims, and more specifically, what is required for a party to obtain summary judgment on such claims.

<u>DISCUSSION</u>

**Title VII Claims[26]**

Defendant has moved for summary judgment on all claims brought by Plaintiffs.[27] Title VII makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). Race, national origin, color, and religious discrimination are, respectively, separate types of Title VII claims. *Wakefield v. Child.'s Hosp.*, No. C2-06-1034, 2008 WL 3833798, at *6 (S.D. Ohio Aug. 13, 2008); *see also Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991), *abrogated on other grounds by Igwe v.*

---

[26] As noted above, with respect to each Plaintiff, the Court will conduct only one analysis of each type of claim (discrimination, retaliation, hostile work environment), regardless of the statute (Title VII, § 1981, and THRA) under which the type of claim is brought. Although the legal framework discussed herein describes "Title VII," the legal principles likewise apply to § 1981 and THRA.

[27] As explained above, each Plaintiff asserts claims of (1) race discrimination, (2) retaliation, and (3) hostile work environment. (Doc. No. 1). Plaintiffs do not, however, list each claim as a separate "count" in the Complaint. Rather, Plaintiffs simply allege that Defendant's conduct as it is described in the Complaint gives rise to claims that Defendant discriminated against them, retaliated against them, and created a hostile work environment. (*Id*. at ¶¶ 22-24).

*Salvation Army*, 790 F. App'x 28, 36 (6th Cir. 2019). Plaintiffs claim that they were discriminated against based only on their race as African Americans.

**Legal Framework for Title VII Claims: Direct and Indirect Evidence**

To survive a defendant's motion for summary judgment ruling on a Title VII claim for disparate treatment,[28] a plaintiff may seek to raise a genuine issue of material fact by offering either direct evidence of discrimination or indirect (i.e., circumstantial) evidence of discrimination in accordance with the familiar so-called *McDonnell Douglas* burden-shifting framework.[29]

I.   Direct Evidence[30]

"[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.'" *Bartlik v. U.S. Dep't of Lab.*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to

---

[28] "Disparate treatment" is an umbrella term used to refer to discrimination against an employee based on the employee's membership in a protected class. The Supreme Court has explained the term as such:

> Several of our decisions have dealt with the evidentiary standards that apply when an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin. In such "disparate treatment" cases, which involve "the most easily understood type of discrimination," *Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S. Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977), the plaintiff is required to prove that the defendant had a discriminatory intent or motive.

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988) (distinguishing disparate treatment from disparate impact cases).

[29] "Direct evidence is such that, if true, requires the conclusion that unlawful retaliation [or discrimination] was a motivating factor without any inferences or presumptions." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 693 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999)). Indirect evidence is evidence that requires the court to make inferences to conclude that unlawful retaliation or discrimination was a motivator for an adverse employment action.

[30] Plaintiffs assert that their claims are premised on both direct evidence and indirect evidence. However, for reasons discussed herein, the Court rejects that Plaintiffs have shown direct evidence to support their claims.

draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). "Whatever the strength of the evidence, it is not 'direct' evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005) (quoting *Norbuta v. Loctite Corp.,* 1 Fed. App'x. 305, 313 (6th Cir. 2001)). If an inference is required to draw from the evidence the conclusion that an employer was animose against a protected class—for example, if an inference is required to reach the conclusion that a comment refers to a protected class or the plaintiff's membership in a protected class—then the evidence is not direct evidence. *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 825 (N.D. Ohio 2006). And to be direct evidence, "the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

"Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin v. Potter*, 79 F. App'x 893, 899 (6th Cir. 2003). "Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'" *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998).

Unlike in indirect evidence cases, which always involve the *McDonnell Douglas* framework described below, "[i]n direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d

559, 563 (6th Cir. 2000); *see also Norbuta*, 1 F. App'x at 311–12 ("If a plaintiff produces credible direct evidence of discrimination, discriminatory animus may be at least part of an employer's motive, and in the absence of [rebuttal evidence sufficient to remove any genuine issue (doubt) that the employer would have terminated the plaintiff even absent a discriminatory motive], there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court."); *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 382 (6th Cir. 2002) ("In contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."). "In particular, the burden of persuasion stays with the plaintiff throughout the *McDonnell Douglas* analysis; in contrast, the defendant in a direct evidence case has the burden to show that its stated reason for acting against the plaintiff was not pretextual." *Erwin*, 79 F. App'x at 899. In the summary judgment (as opposed to trial) context, the defendant-movant's burden is to remove all doubt about pretext, i.e., remove any genuine issue of material fact as to whether it would have terminated the plaintiff even had it not been motivated (in part) by discriminatory animus.

"Racial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence."[31] *Erwin*, 79 F. App'x at 897; *see also Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 331 (6th Cir. 2003) (noting that "a variety of statements referring to the employee's protected status"

---

[31] A decisionmaker is one who "exercised supervisory authority, imposed discipline, and influenced hiring and firing at the company . . . The management determination is not confined to labels but rather must be assessed in light of functions." *EEOC v. Ralph Jones Sheet Metal, Inc.*, 777 F. Supp. 2d 1119, 1124 (W.D. Tenn. 2011).

would constitute direct evidence if they "require the conclusion that unlawful discrimination was at least a motivating factor" (citation omitted)); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) (evidence of repeated age-based comments showed a material dispute of fact regarding whether "stereotypical beliefs about the capabilities of older managers that influenced [the defendant's] decision to demote" the plaintiff) (discussed in *Cushman-Lagerstrom*). "But that is not to say that comments constitute direct evidence of discrimination merely because they were made by a supervisor or decisionmaker. Indeed, in many cases a supervisor's comments have been found not to constitute direct evidence." *Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-CV-00491, 2022 WL 12830807, at *25 (M.D. Tenn. Apr. 28, 2022) (citing *Worthy v. Michigan Bell Tel. Co.*, 472 F. App'x 342, 343 (6th Cir. 2012); *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 661 (6th Cir. 1999); *Preston v. Berendsen Fluid Power*, 125 F. Supp. 2d 245, 250 (W.D. Mich. 2000)).

"The context in which the comments are made is also critical. Discriminatory remarks made while implementing an adverse employment action are likely to reveal animus." *Erwin*, 79 F. App'x at 898. However, "occasional disparaging remarks made during the regular course of business [rather than while implementing an adverse employment action] about [race] or other protected characteristics are much more likely to be considered the kind of 'isolated and ambiguous' comments that do not trigger employer liability." *Id.* at 897 (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993)); *see also Nasrallah v. Robert Half Int'l, Inc.*, No. 1:19-CV-00795, 2020 WL 1862657, at **5-8 (N.D. Ohio Apr. 14, 2020). Thus, courts often look for a "temporal proximity between the discriminatory act and the termination." *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) (reversing summary judgment when plaintiff claimed that supervisor had called him a "dirty wop," a reference to his Italian-American heritage, three weeks

before his termination), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). And notably, in this context a remark is ambiguous if it is subject to being interpreted in a benign, non-discriminatory way. *See Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 55 (1st Cir. 2021).

II.   <u>Indirect Evidence (*McDonnell Douglas*)</u>

As noted above, a plaintiff may alternatively seek to raise a genuine issue of material fact by relying on theory of so-called indirect (i.e., circumstantial) evidence of discrimination in accordance with the familiar so-called *McDonnell Douglas* burden-shifting framework. The burden-shifting approach in *McDonnell Douglas* applies only to discrimination or retaliation claims premised on indirect evidence. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606– 07 (6th Cir. 2019). A plaintiff may pursue an employment discrimination claim through an indirect evidence theory as follows:

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin*, 921 F.3d at 606–07 (citations omitted).

Thus, if only indirect (and no direct) evidence is present, the plaintiff bears the burden under *McDonnell Douglas* of first showing its *prima facie* case of race discrimination, i.e., that:

> 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 502 (6th Cir. 2007) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000)). Notably, with respect to an indirect-evidence *prima facie* case, the burden of proof upon the plaintiff preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

If and when the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show some legitimate, non-discriminatory explanation for its action(s).[32] *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Importantly, as to the existence of legitimate and non-discriminatory reasons for its action(s), the defendant bears only the burden of production and not the burden of persuasion. *Garren v. CVS Rx Servs., Inc.*, 482 F. Supp. 3d 705, 717 (E.D. Tenn. 2020) (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)). To meet that burden of mere production, "the defendant need not *persuade* the court that it was actually motivated by the proffered reason[s]." *Texas Dep't of Cmty. Affs. v. Burdine,* 450 U.S. 248, 254 (1981) (emphasis added). Rather, "[i]t is sufficient if the defendant's evidence *raises a genuine issue of fact* as to whether it discriminated against the plaintiff [or instead took action against the plaintiff based on a legitimate, non-discriminatory reason]." *Id.* (emphasis added). To raise such genuine issue, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection[, which] must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant only has to present [evidence of] 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Harris*, 836 F. App'x at 419

---

[32] At times herein, for the sake of the Court uses just one rather than both of the terms "legitimate" and "non-discriminatory," while being aware that to the extent that there is any real distinction between them, both are applicable to the defendant's required showing at *McDonnell Douglas* step 2.

(quoting *Burdine*, 450 U.S. at 258).[33] Notably, the case law does not seem to frame this burden in terms of a particular quantum of proof—for example, preponderance of the evidence; the undersigned has been unable to identified the required quantum but is context that it is a relatively low burden that is typically met whenever the defendant has any actual evidence tending to suggest that, at the time of the adverse action in question, it had a legitimate reason for the adverse action.[34]

If the defendant carries its burden to show a legitimate nondiscriminatory reason, then finally the burden shifts back to the plaintiff to show—by a preponderance of the evidence[35]—that

---

[33] The bracketed words added by the Court to this quote are significant; they denote the difference between a burden (a) merely to *articulate* (or state) some non-discriminatory reason(s) that supposedly motivated the employment decision, and (b) to *provide some evidence* that there was/were some non-discriminatory reason(s). It is true that some cases use language that seemingly suggests that the burden is the former. *E.g., Redlin*, 921 F.3d at 607*; Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001); *Petway v. Textron Aerostructures*, No. 93-6114, 1994 WL 70862 (6th Cir. Mar. 3, 1994) ("[the defendant] met its burden of articulating a legitimate non-discriminatory reason for [the plaintiff's] transfer by stating that she was selected for force reduction pursuant to its SFR procedure."). But both *Burdine* and *Harris* (which, as noted, was relying on *Burdine)* make clear that the employer meets its burden of production only if it presents not merely *some statement* of what the employer now says the reason was, but rather evidence of what the reason actually was at the time in question. So although this may indeed be a burden of articulating a reason, it is a burden of articulating a reason supported by *evidence*.

[34] For example, the undersigned believes that a defendant meets its burden if it offers evidence that at the time of the adverse action in question, it gave a legitimate reason for the adverse action—even if the defendant does not offer evidence independently suggesting that the reason the defendant gave was the actual reason. That is to say, evidence of a merely *purported* reason for the adverse action, if legitimate and especially if given at the time of the adverse action itself (rather than as a post-hoc justification for the adverse action), is one way for a defendant to satisfy its burden at stage two of *McDonnell Douglas*.

[35] The "preponderance of the evidence" standard referred to here is the standard that *would apply* at trial. (The Court says this fully aware that it is doubtful that the *McDonnell Douglas* framework even applies at trial; but whether or not the framework does apply at trial, the summary judgment standard is tied to a trial burden *as if* the framework did apply at trial). At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury could make the required finding by a preponderance. This is because, on motion for summary judgment, the question at each stage of *McDonnell Douglas* is "whether there is sufficient evidence to create a genuine dispute at each stage." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch*., 974 F.3d 652, 661 (6th Cir. 2020) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). And as suggested elsewhere herein, that means the question is whether there is sufficient evidence for a jury to find in favor of the party bearing the burden at a particular stage, under the specific standard applicable to that stage.

So at the first stage of *McDonnell Douglas*, wherein the plaintiff must show an indirect-evidence *prima facie* case by a preponderance of the evidence, on motion for summary judgment (assuming the defendant

the reason offered by the defendant is a pretext for discrimination. *McDonnell Douglas*, 411 U.S.

at 802-04 (1973); *Burdine*, 450 U.S. at 255. This resulting burden is one of persuasion, and this

burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading

the court that she has been the victim of intentional discrimination." *Id*. at 256. As the Sixth Circuit

has put it, explaining how the second and third stages of *McDonnell Douglas* work:

> [O]nce a defendant "responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection," whether or not the plaintiff made out a prima facie case "is no longer relevant." Rather, by producing evidence of its nondiscriminatory reason, a defendant has moved the inquiry to the ultimate factual question of whether its action against the plaintiff was discriminatory or not, and plaintiff thereafter enjoys the opportunity to rebut that reason and show discrimination.

*Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) (citations and internal quotation

marks omitted).

All of this means, among other things, that if and when the burden has shifted back to the

plaintiff, the plaintiff must show by a preponderance of the evidence each of two components of

pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a

pretext for discrimination. *Kirilenko-Ison*, 974 F.3d at 661. To defeat a summary judgment motion

in such circumstances, the plaintiff must produce sufficient evidence from which the jury could

---

is able to meet its initial burden so as to shift the burden to the plaintiff), the plaintiff need not convince the presiding judge himself or herself by a preponderance; rather, the plaintiff must convince the presiding judge only that a *reasonable jury could* be convinced by a preponderance of the evidence. (Notably, this is the relevant question in the summary judgment analysis even though a jury actually would never be asked whether the plaintiff established *prima facie* case if, as seems likely, *McDonnell Douglas* is inapplicable at the trial phase). And if on motion for summary judgment the presiding judge reaches the third stage of *McDonnell Douglas*—with its preponderance-of-the-evidence standard for the plaintiff to meet—the question for the presiding judge is not whether *he or she actually* finds by a preponderance of the evidence that the defendant's stated reason is pretextual and that the real reason was discriminatory animus; instead, the question is whether he or she concludes that the plaintiff has shown that *a reasonable jury could find* that this is the case.

As for the second stage, as to which the case law says little about the required quantum of proof for the defendant, it likely suffices to say that there must be *some* evidence to support a claim (even if not to the point of showing by a preponderance) that there was a legitimate reason for the challenged adverse action.

reasonably reject the defendant's explanation and infer by a preponderance that the defendant intentionally discriminated against him. *Braithwaite*, 258 F.3d at 493.

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Clark v. Walgreen Co*., 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson*, 319 F.3d at 866).

"The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co*., 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.'" *Brown v. Kelsey-Hayes Co*., 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id*. (citation omitted). But—to make an important distinction the Court emphasizes repeatedly throughout this opinion—in the summary judgment context, this does not mean convincing the presiding judge by a preponderance of the evidence, but rather convincing the presiding judge that a *reasonable* jury could be convinced by a preponderance of the evidence. *See id.* If a plaintiff opposing summary judgment can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, i.e., that the actual reason was discriminatory. That is, as indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *47 EEOC v. Ford Motor Co*., 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993),[36] and *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 148

---

[36] One might reasonably ask whether *St. Mary's*, which as noted in *Ford Motor Co.* required the plaintiff to show both components, effectively overruled *Burdine* in one respect. Specifically, this aspect of *St. Mary's* seems in tension with *Burdine's* statement that the plaintiff may meet its burden of persuasion as to pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. The dissent in *St. Mary's* certainly saw the tension. But as far as the undersigned can tell, *Burdine* has never been considered to have been overruled in any respect, and certainly neither the Supreme Court nor the Sixth Circuit has shown any compunction about citing *Burdine* (at least parts of *Burdine* other than the statement apparently displaced by *St. Mary's* as noted above) in the aftermath of *St. Mary's*. The Court is confident at the very least that the aspects of *Burdine* upon which the Court relies remain good law after *St. Mary's*.

Similarly, one might ask whether *Reeves*, wherein the Supreme Court rejected the idea that a plaintiff must always introduce additional, independent evidence of discrimination at the third stage in order to prevail, effectively overruled *St. Mary's* insofar as *St. Mary's* required the plaintiff to show *both* that the employer's proffered reason was not the real reason for its action *and* that the employer's real reason was discriminatory. But *Reeves* did not overrule *St. Mary's*; rather, it clarified that although a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action *and* that the employer's reason was discriminatory, the plaintiff need not *necessarily* introduce *additional* evidence of discrimination at the third stage to successfully make this showing. As the Supreme Court stated in *Reeves*, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may *permit* the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. at 148 (emphasis added). So according to *Reeves*, while both types of evidence discussed in *St. Mary's* are in fact required for the plaintiff to ultimately prevail, the focus at the third stage is not on whether the plaintiff has offered some *new* evidence (in addition to any evidence already used to establish its *prima facie* case and to demonstrate that the employer's proffered reason for its action was not the real reason) to show that the real reason for the adverse action was discriminatory. Rather, (assuming the plaintiff has already shown that the employer's proffered reason was not the real reason for its adverse action) the focus is simply on whether the plaintiff can show by a preponderance of the evidence that the real reason for the employer's adverse action was discriminatory—and that showing conceivably could (depending on the circumstances) be made by pointing solely to the very evidence that was already used by the plaintiff to establish his or her *prima facie* case and/or show that the employer's proffered reason for its action was not in fact the real reason.

(2000)).[37] In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for discrimination. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful [discrimination] in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the actual reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence of both kinds, even if it turns out to all be the same evidence.

When a defendant-movant challenges a plaintiff's ability to show genuine issue of material fact on an indirect-evidence theory of employment discrimination, the defendant may try to prevail at the first step (i.e., by contesting the plaintiff's ability to show a genuine issue on his indirect-evidence *prima facie* case), or at the second and third steps (by asserting that the defendant had a legitimate, non-discriminatory reason and contesting the plaintiff's ability to show a genuine issue

---

[37] One might ask why it is not enough to speak simply in terms of the requirement to show that the real reason was retaliation (the second component of pretext) without mentioning a separate requirement to show that the real reason was not the (non-retaliatory) reason proffered by Defendant (the first component of pretext). After all, the second seems necessarily subsumed in the first. But the Sixth Circuit has articulated these as separate requirements that each must be satisfied, and so the Court will proceed accordingly.

of material fact as to whether such reason was pretextual), or both at the first step and at the second and third steps. The undersigned has previously explained what is required to prevail at each step:

> To prevail at the first step of *McDonnell-Douglas*, the defendant, as the summary-judgment movant, must meet its initial burden of showing an absence of evidence from which a reasonable jury could find the plaintiff established a *prima facie* case. *E.g.*, *Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). If the defendant does so, then the burden shifts to the plaintiff to show that at trial it could "make out a *prima facie* case of discrimination by a preponderance of the evidence." *Redlin*, 921 F.3d at 606. If the plaintiff fails to succeed here, then the plaintiff suffers summary judgment in favor of the defendant on the claim. But if the plaintiff succeeds here, defendant does not prevail at the first step and is relegated to try instead to prevail at the second and third steps of *McDonnell-Douglas*.

> At the second step, the defendant-movant has the burden (of production only) to show a legitimate and non-discriminatory reason for its action(s). *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). If the defendant successfully shows evidence of a non-discriminatory reason for its alleged discriminatory act, the court proceeds to the third step, where "the plaintiff must rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext" for unlawful discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotations omitted).

*Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 1231229, at *9-10 (M.D. Tenn. Apr. 26, 2022).[38]

---

[38] To say (as the Supreme Court has said) that the defendant has a burden of production is to say only that the defendant merely has to offer admissible evidence *adequate to support a claim* that the defendant had such a reason. (As noted elsewhere herein, it is unclear the extent to which the evidence must support the claim and in particular whether the evidence must support such claim to the degree necessary to enable a reasonable jury to credit the claim by a preponderance of the evidence). By contrast, to say that the defendant has a burden of persuasion (which the Supreme Court has expressly declined to do) is to say that the defendant-movant must convince the applicable fact finder that the defendant *actually had* such a reason; in the summary-judgment context, this would mean that the defendant has a burden to show that no reasonable jury could fail to find that the defendant-movant had such a reason. *See Benitez*, 2022 WL 58399, at *22.

The undersigned has also summarized (as succinctly as possible) the indirect-evidence framework as applied to claims of employment discrimination and/or retaliation on motions for summary judgment as follows:

> To obtain summary judgment on Title VII or THRA claims grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if : (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's indirect-evidence *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.

*Benitez*, 2022 WL 58399, at *23.

## Analysis of Plaintiffs' Title VII Claims

The Court will analyze each type of claim (race discrimination, retaliation, and hostile work environment) separately. With respect to Plaintiffs' claims of race discrimination, the Court will first explain why Plaintiffs have failed (despite their assertions to the contrary) to present direct evidence of discrimination. With respect to Plaintiffs' discrimination and retaliation claims (both of which are premised on an indirect-evidence theory under the *McDonnell Douglas* framework),[39] the Court will focus specifically on the indirect evidence supporting each specific type of claim of

---

[39] Plaintiffs' race-discrimination claims are purportedly premised on a direct-evidence theory (which the Court rejects for the reasons stated herein), and in the alternative, an indirect-evidence theory.

each Plaintiff.[40] The Court then will consider together Plaintiffs' respective claims of hostile work environment. Because each type of claim is premised on generally the same set of facts—and because Plaintiffs rely solely on testimony from their respective depositions as evidence to support all claims, the Court's analysis of one type of claim will often overlap significantly with the Court's analysis of another type of claim. However, the analysis will differ with respect to each Plaintiff as to some elements of their respective discrimination and retaliation claims because they base certain elements (such as the adverse employment action each allegedly suffered) on different conduct in which Defendant's employees allegedly engaged. In short, the analysis is: (a) specific as to the type of claim (race discrimination, retaliation, and hostile work environment); and (b) specific to each Plaintiff to an extent; but (c) not specific as to statute.

I.    Race Discrimination

    A.    Direct-Evidence Theory

Plaintiffs claim that they have presented direct evidence of racial discrimination in the form of racially derogatory comments allegedly made to Plaintiffs by Defendant's employees. (Doc. No. 31 at 7). Specifically, Plaintiffs point to their own respective depositions in which both Plaintiffs testified that their supervisor (Davis), and Davis's supervisor (Claytor),[41] repeatedly used the term "monkey ass" when referring to Plaintiffs. (Doc. Nos. 33-1 at 46-47, 54, 56, 95; 33-2 at

---

[40] It is undisputed that as to each claim brough under Title VII, each Plaintiff is a member of the applicable protected class for purposes of that claim. (Doc. No. 25 at 14).

[41] Although Plaintiffs now argue that both Smith and Claytor used the term "monkey ass" when referring to Plaintiffs, Smith in his testimony stated only that Davis and "the [dispatcher] before [Davis]," referred to him as "monkey ass." (Doc. No. 33-1 at 54). It is unclear whether Smith's testimony was intended to refer to (in addition to Davis) Claytor or someone else, as the record does not suggest that anyone other than Davis would have worked as Smith's dispatcher during the short time (six months) that Smith worked for Defendant. Nevertheless, because Plaintiffs clearly assert in their Response that both Davis and Claytor referred to them using the term "monkey ass," (Doc. No. 31 at 18), the Court (construing the evidence in favor of the non-movants, i.e., Plaintiffs) construes Smith's testimony of "the [dispatcher] before [Davis]," as referring to Claytor.

153-55). Plaintiffs also point to their respective deposition testimony as evidence that Davis and Claytor criticized and belittled them by their tone of voice, and that Davis and Claytor did not criticize or belittle non-African American drivers in this way. (Doc. Nos. 33-1 at 54-56, 76, 78; 33-2 at 125-26, 131-32, 152-53). Plaintiffs claim that this evidence is sufficient to raise a genuine issue of material fact as to whether Defendant was predisposed to discriminate on the basis of race and acted on that predisposition in their situations. (Doc. No 31 at 7).

Defendant argues in response that even if the Court credits Plaintiffs' testimony that Davis and Claytor addressed Plaintiffs using the term "monkey ass,"[42] that gets Plaintiffs nowhere because (according to Defendant) Plaintiffs have not shown that the term "monkey ass" is racially motivated or race-specific. (Doc. No. 39 at 2). Accordingly, Defendant argues, Plaintiffs' deposition testimony is not direct evidence because it would require an inference to reach the conclusion that the term "monkey ass" was a reference to African Americans. (*Id*.). Defendants argue also that Defendants' testimony that they were called "monkey ass" is not direct evidence because Plaintiffs have not shown that term was used in close temporal proximity to any adverse employment action. (*Id*.).

The Court agrees with Defendant that Plaintiffs' deposition testimony asserting that Davis and Claytor referred to Plaintiffs as "monkey ass" is not direct evidence of discrimination. Though Plaintiffs' supervisors allegedly used the term "monkey ass" to refer to Plaintiffs, Plaintiffs have not offered any evidence even tending to show that the term (if in fact used) was tied to any purported adverse employment action taken against either Plaintiff. This fact distinguishes this case from *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004), a Sixth Circuit case on which Plaintiffs

---

[42] Defendant points out that Plaintiffs do not point to a single reference to the term "monkey ass" (or, for that matter, to any complaints of discrimination) in over 36,000 lines of Qualcomm messages.

rely for the proposition that "discriminatory remarks constitute direct evidence of . . . discriminatory animus." (Doc. No. 31 at 7-8). In *DiCarlo*, the Sixth Circuit concluded that comments made by the plaintiff's supervisor suggesting animus against Italian-Americans like the plaintiff were direct evidence in part because they were made three weeks before the plaintiff's termination and therefore exhibited a temporal connection to the adverse action. *Id*. at 417. Here, by contrast, Plaintiffs offer no evidence suggesting that the comments were made in close temporal proximity (or were otherwise connected) to any adverse action to which either Plaintiff was allegedly subjected.

Additionally, the statements would require a factfinder to draw multiple inferences in order to conclude from them that the adverse action(s) allegedly taken against Plaintiffs (in Sneed's case, his termination, and in Smith's case, his alleged constructive discharge) were motivated by animus against African Americans. First, a factfinder would need to infer that the use of "monkey ass" was derogatory specifically toward African Americans.[43] Second, a factfinder would need to infer from the comments (if in fact they had been made and were illustrative of racial animus against Plaintiffs) that Plaintiffs' race motivated the adverse employment actions allegedly taken against them. Thus, the comments are not direct evidence because they simply do not "*require* the conclusion that unlawful discrimination was at least a motivating factor" of the adverse actions allegedly taken my Defendant. *Cushman-Lagerstrom*, 72 F. App'x at 331 (emphasis added). The Court therefore concludes that Plaintiffs have not shown any direct evidence of race discrimination.

---

[43] The Court is not necessarily denying that such an inference would be reasonable. The point is that the inference (whether or not reasonable) would have to be drawn—thus making Plaintiffs' testimony about the making of the statements something other than direct evidence.

B.     Indirect-Evidence Theory

As noted above, a defendant-movant challenging a plaintiff's ability to raise a genuine issue on an indirect-evidence theory of employment discrimination may try to prevail at the first step (i.e., by contesting the plaintiff's ability to reach a jury on his indirect-evidence prima facie case), or at the second and third steps (by asserting that the defendant had a legitimate, non-discriminatory reason and contesting the plaintiff's ability to reach a jury on the issue of whether such reason was pretextual), or both at the first step and at the second and third steps.

i.     *Plaintiff Sneed*

With respect to Sneed, Defendant seeks to prevail both at the first step and at the second and third steps of the *McDonnell Douglas* framework. At step one, Defendant challenges the ability of Sneed to raise a genuine issue of fact as to each of the last three elements of an indirect *prima facie* case of race discrimination. At steps two and three, Defendant asserts that it had a legitimate, nondiscriminatory reason for terminating Sneed and that Sneed cannot raise a genuine issue of fact as to whether that reason was pretextual.

Defendant argues that Sneed's race discrimination claim fails at step one because he cannot point to evidence showing (i) that he performed his job satisfactorily, (ii) that he suffered an adverse employment action, or (iii) that a proper comparator that he was treated less favorably than. Alternatively, Defendant argues that even if Sneed could establish that a reasonable jury could find that he satisfied all elements of an indirect-evidence *prima facie* case of discrimination, Sneed's claim would fail at steps two and three because (according to Defendant) had a legitimate, non-discriminatory reason for firing him,[44] and Smith cannot establish pretext.

_____

[44] Specifically, Defendant asserts that its legitimate, non-discriminatory reason for firing Sneed was that he refused to work. (Doc. No. 25 at 14).

Regarding the two-part second element of Sneed's indirect-evidence *prima facie* case (that he was qualified for his job and performed it satisfactorily), Defendant does not dispute that Sneed was qualified for his job (the first of the two parts of the second element). But in order to establish the second element of his *prima facie* case, Sneed must show that he performed his job *satisfactorily* (the second of the two parts of the second element). *Hughes*, 212 F. App'x at 502 (quoting *Johnson*, 215 F.3d at 572–73). Defendant argues that Sneed cannot make this showing because, according to Defendant, "Sneed was fired for refusing loads and/or failing to report to work after he was counseled both verbally and in writing." (Doc. No. 25 at 14 (citing Doc. No. 25-2 at 6)). But the Sixth Circuit has cautioned against a defendant-employer conflating the stages of the *McDonnell Douglas* framework by improperly relying on its purported reasons for firing a plaintiff-employee at step one, i.e., in its attempts to challenge the plaintiff-employee's *prima facie* case, and for good reason. As the Sixth Circuit has explained,

> [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

*Wexler*, 317 F.3d at 574; s*ee also Cline*, 206 F.3d at 660–61 ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."); *Camalo v. Xerox Corp.*, No. 16-CV-13667, 2019 WL 764222, at *3 (E.D. Mich. Feb. 21, 2019) (holding that the court could not consider the plaintiff's poor job performance—a factor that played at least some role in the defendant's purported legitimate non-discriminatory reason for termination—at the *prima facie* stage because doing so would deprive the plaintiff of the opportunity to show that the reason was pretextual).

On the other hand, a defendant-movant *can* rely on evidence of unsatisfactory performance in order to shift the burden to the plaintiff to show evidence sufficient to satisfy this element of a *prima facie case* (which requires both that the plaintiff be qualified *and* that he performed satisfactorily). But evidence of actual unsatisfactory performance is *not* the same thing as evidence that the adverse action was taken on the grounds of (alleged) unsatisfactory performance—especially given that an adverse action can be taken on the grounds of unsatisfactory performance even if objectively there actually was no unsatisfactory performance and that indeed a defendant can prevail (at steps two and three) on a plaintiff's indirect-evidence case if it can show that the adverse action was taken in good faith on a subjective (even if objectively unreasonable) belief that the plaintiff's performance was unsatisfactory.

As noted above, Defendant argues that Sneed cannot show he performed satisfactorily, because (according to Defendant) he "was fired for refusing loads and/or failing to report to work after he was counseled both verbally and in writing." (Doc. No. 25 at 14). In support of the quoted assertion, Defendant cites to Wright's declaration wherein Wright states that Sneed was terminated for refusing loads and/or failing to report to work. (Doc. No. 25-2 at ¶ 23). In her declaration, Wright cites to Qualcomm messages showing that Sneed received verbal and written warnings from Brown about these performance issues. (*Id.* citing Doc. No. 25-7)). The Qualcomm messages (cited by Wright in her declaration, but not by Defendant in its Memorandum) substantively provide support for the assertion that Sneed *actually performed unsatisfactorily*, but because they are inadmissible hearsay to the extent offered to prove the truth of that assertion, the Court may not consider them for that purpose in deciding the instant Motion.[45] And although Defendant relies

---

[45] Generally, "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Hearsay evidence is an out-of-court assertion (including primarily, but not exclusively, written and oral statements) offered to prove the truth of the matter asserted. Fed. R.

also on Wright's declaration, the statements contained therein support only that Sneed *was fired for* continuing to exhibit poor performance. As explained above, the assertion that the adverse action was taken on the grounds of unsatisfactory performance is different than the assertion that Sneed's performance was *actually unsatisfactory*; and the former is the kind of assertion that (under *Wexler* and *Cline*) is impermissible (and simply inapt) at stage one of *McDonnell Douglas*. So Defendant has not offered any *admissible* evidence showing what Defendant must show to attack the second part of the second element of Sneed's indirect-evidence *prima facie* case: that Sneed *actually performed unsatisfactorily*. At best, Defendant has offered evidence of what its reason (whether justified or unjustified) was for terminating Sneed[46]—i.e., evidence that Sneed was terminated because Defendant actually thought (rightly or wrongly) that he had performed unsatisfactorily— and the Court may not consider at the *prima facie* stage what the reason was for firing Sneed. And Defendant (having failed to successfully challenge the second part of the second element of Sneed's indirect-evidence *prima facie* case) does not dispute Sneed's qualifications (the first part of the second element).[47] Therefore, the Court concludes that Defendant has not met its initial burden to show the absence of a genuine issue of material fact as to the second element.

---

Evid. 801(c). Brown's Qualcomm messages to Sneed (cited by Wright in her declaration) are inadmissible hearsay if offered to prove that Sneed actually performed unsatisfactorily.

[46] The Court is drawing here the important distinction between (a) evidence tending to show *an employee actually performed unsatisfactorily* and (b) evidence tending to show that a person was fired based on *the employer's sincere belief that the employee performed unsatisfactorily* even if the employee in fact did perform satisfactorily. Defendant here presents the latter kind of evidence, which is not even cognizable to challenge an indirect-evidence *prima facie* case; to attack the second part of the second element of the *prima facie* case, what Defendant actually needs is the former kind of evidence.

[47] If Defendant had challenged Sneed's qualifications, the challenge would be rebuffed by Sneed who presented evidence showing that he went to truck driving school, had his CDL before joining Defendant as an employee, and had prior experience driving trucks. (Doc. No. 33-3 at 2). Thus, even if the burden had shifted to him to show that he was qualified for his job with Defendant for purposes of the second element of his *prima facie* case, Sneed would have satisfied that burden.

Moving on to the third element of the indirect-evidence *prima facie* case, Defendant argues that Sneed did not suffer an adverse employment action when he was terminated, because (again, according to Defendant) he "was fired for refusing to work" rather than being fired because of his race. (Doc. No. 25 at 14).[48] But Defendant misunderstands the third element. "The question as to this element is simply whether [Sneed] has suffered an 'adverse action'—which clearly he has—and not whether he has suffered an adverse action linked to [his race]. The existence (or non-existence) of *any relationship between* the adverse action and his [race]—i.e., the issue of causation—is simply not implicated in this element, and instead is implicated (if at all) only later in the *McDonnell-Douglas* framework." *Benitez*, 2022 WL 1283087, at *50 (internal citations omitted). It is true that the issue of causation is implicated as an element of an indirect-evidence *prima facie* case for *retaliation* under Title VII.[49] *See Carlson v. Leprino Foods Co.*, 522 F. Supp. 2d 883, 888-89 (W.D. Mich. 2007) ("Defendant unquestionably terminated Plaintiff's employment, and termination satisfies the adverse-employment-action element of the prima facie case [for a

---

[48] It is unclear whether Defendant actually intends to dispute Sneed's claim that his termination constituted an adverse employment action. On page 14 of its Memo, as noted above, Defendant argues that Sneed cannot show that he suffered an adverse employment action, because he was "fired for refusing to work." (Doc. No. 25 at 14). On page 17 of its Memo, however, Defendant takes a different position, writing that "while Sneed admittedly suffered an adverse employment action, there is no casual connection between any protected activity and his termination." (Doc. No. 25 at 17). Then, in its Reply, Defendant again suggests that Sneed's termination is not an adverse employment action because he "was fired for cause." (Doc. No. 39 at 3).

Defendant appears to conflate the stages of the *McDonnell Douglas* framework. Specifically, Defendant's argument suggests that it (mistakenly) believes that Sneed's termination would not constitute an "adverse employment action" if he was terminated for "legitimate reasons." (*Id*.). As explained more fully herein, the reason(s) for Sneed's termination are certainly pertinent to whether Sneed can establish an indirect-evidence *prima facie* case of retaliation, and whether he can establish an indirect-evidence case of general discrimination on the basis of race, but they have no bearing on whether Sneed's termination constitutes an adverse employment action for purposes of establishing, in particular, the *prima-facie*-case portion of his claim of general discrimination based on race.

[49] Specifically, as set forth below, causation is the fourth and final element of an indirect-evidence *prima facie* case of retaliation.

claim of retaliation]. The pivotal issue on the prima facie case analysis is whether Plaintiff has produced evidence sufficient to permit a finding of cause. Plaintiff must produce evidence sufficient to raise the inference that his protected conduct was the likely reason for his termination."). But as the undersigned has stated (using the term "general discrimination" to refer to discrimination based on a protected class, to distinguish such discrimination from discrimination in the form of *retaliation*):

> [F]or a *general* claim of discrimination, the concept of causation is nowhere to be found in the elements of an indirect-evidence *prima facie* case and instead is implicated only if and when the court assesses whether the defendant appeared to have had a legitimate non-discriminatory reason and, if so, whether such reason in fact was pretextual. So the Court rejects the notion that a plaintiff who (supposedly) has not *causally connected* his termination to discriminatory animus has not shown the third element of an indirect-evidence *prima facie* case of general discrimination; if the plaintiff was terminated, the plaintiff has shown that element, period.

*Benitez*, 2022 WL 1283087, at *50 (footnote omitted).[50]

The parties agree that Sneed was terminated, and termination clearly qualifies as an adverse employment action.[51] Thus, Defendant has not met its initial burden to show preliminarily the

---

[50] To an extent, the apparent law regarding constructive discharge is somewhat (though not directly) in tension with this. As noted herein, it appears that events do not count towards a finding of intolerable conditions (required for a constructive discharge) unless they are the result of a discriminatory animus. To this extent, the specific adverse action of constructive discharge *does* need to be connected to discriminatory animus. The Court declines to opine (or speculate) as to why constructive discharge is treated differently in this respect, except to say that constructive discharge is a unique kind of adverse action. But in any event, once a finding is made that there was a constructive discharge, then this element of an indirect-evidence *prima facie* case is satisfied, and—just as in the case of termination—the defendant may not negate that element by going back and showing that the constructive discharge is somehow not sufficiently causally connected to a discriminatory motive.

[51] Termination is a quintessential example of an adverse employment action. *See e.g., Eberhardt v. First Centrum, LLC*, No. 05-71518, 2007 WL 518896, at *6 (E.D. Mich. Feb. 15, 2007) ("Examples of adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." (internal quotation marks omitted)); *O'Donnell v. City of Cleveland*, 148 F. Supp. 3d 621, 638 (N.D. Ohio 2015) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands."), *aff'd*, 838 F.3d 718 (6th Cir. 2016).

absence of a genuine issue of material fact as to whether Sneed suffered an adverse employment action.

The fourth element of an indirect-evidence *prima facie* case of discrimination is that the plaintiff was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class (known as a "comparator" or "comparable"). To meet its initial burden of showing that Sneed cannot establish that he was replaced by a person outside his protected class, Defendant points to Wright's declaration stating that Defendant did not hire anyone specifically to replace Sneed. (Doc. No. 25 at 15 (citing Doc. No. 25-2 at ¶ 27)). Defendant cites also its responses to Plaintiffs' interrogatories to support the same point. (Doc. No. 39 at 4 (citing Doc. No. 20-1 at 11)). This is sufficient to shift the burden to Sneed.

In response, Sneed does not offer any evidence suggesting that Defendant replaced him with a person outside his protected class. Rather, Sneed notes that the issue of who was hired to replace Plaintiffs was a topic in Plaintiffs' Rule 30(b)(6) Notice of Deposition to Defendant. (Doc. No. 31 at 5). Sneed argues that because Wright—as Defendant's Rule 30(b)(6) witness—testified that she "d[id] not know" who replaced Sneed (or, for that matter, Smith) (Doc. No. 33-4 at 55) even after this specific issue was included as a topic in Plaintiffs' Rule 30(b)(6) Notice of Deposition, Sneed has established that he was replaced by a person outside his protected class. Sneed, however, offers no argument or authority supporting the notion that Wright's lack of knowledge on this point at her deposition—even if she was Defendant's designated 30(b)(6) witness, and even if the specific issue was included as a topic in the notice of deposition—is evidence sufficient to raise a genuine issue as to whether Defendant replaced Sneed with a person

outside his protected class;[52] and indeed it certainly is *not* evidence that Defendant did replace Sneed with someone outside of his protected class. Accordingly, the Court rejects Sneed's conclusion that he has raised a genuine dispute of fact as to the fourth element of his *prima facie* case by (supposedly) showing that he was replaced by someone outside his protected class.

As noted above, though, a plaintiff can establish the fourth element alternatively by showing that he or she was treated less favorably than a similarly situated individual outside his or her protected class (i.e., a "comparator" or "comparable"). To make such a showing, a plaintiff "must show that the 'comparables' are similarly situated *in all* respects." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (quoting *Stotts v. Memphis Fire Dep't.*, 858 F.2d 289 (6th Cir. 1988)); *see also Hughes*, 212 F. App'x at 503 (finding *prima facie* case for disparate pay could not be met when plaintiff did not show other employees were similarly situated); *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006) (same). The reference here is actually to all *material* respects; a plaintiff is "required to prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of the [comparator's]." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). "Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or

---

[52] In other words, it does not appear that a *non-movant plaintiff* can rely on the defendant-movant's "I don't know" answer to satisfy the *non-movant's burden* once the burden has shifted to the non-movant. On the other hand, the Court believes that a *defendant-movant* can rely on this kind of "I don't know" answer given by the non-movant to meet the movant's burden of showing preliminarily that the non-movant lacks evidence sufficient to raise a genuine issue—because an "I don't know [of facts necessary to support my claim]" answer given by a non-movant tends to suggest that the non-movant lacks evidence of such necessary facts.

the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583 (citation omitted). "The reality is that to show a valid comparator, the plaintiff must show a specific and close match between the plaintiff's situation and the comparator's situation; this bar is not a low one, even granting that for the most part the bar for establishing a *prima facie* case is not considered especially high." *Benitez*, 2022 WL 1283087, at *43.

Sneed has alleged that he was treated less favorably than comparators in a variety of ways. As compared to non-African American employees, Sneed alleges that he did not receive the same level of training, was assigned older, less desirable trucks, was assigned less desirable routes, and received the same pay for completing more hours of work (resulting in a lower hourly rate of pay). (Doc. No. 1 at ¶¶ 11-12, 14). Sneed also alleges that, unlike non-African American drivers, he was not granted paid time off. (*Id*. at ¶ 13).

To support its argument that Sneed cannot show that he was treated less favorably than a comparator, Defendant points to Wright's declaration stating that during Sneed's employment, all Whites Creek drivers were assigned similar routes and, on average, a similar number of loads per day. (Doc. No. 39 at 4) (citing Doc. No. 25-2 at ¶ 15). Defendant points also to route records that show, consistent with Wright's testimony, that during Sneed's employment with Defendant all Whites Creek drivers drove similar routes and were assigned a similar number of loads per day, on average. (Doc. No. 25 at 7 (citing Doc. No. 25-3)). Wright also states in her declaration that Defendant's records show that all Whites Creek drivers drove the same truck (2018 Peterbilt) during the vast majority of the time that Sneed was employed by Defendant. (Doc. No. 25-2 (citing Doc. No. 25-3)). Two 2019 Peterbilt trucks were driven for a total of seven days during the time Smith was employed, but neither one was driven by a white employee. (Doc. No. 25-3). Moreover, the record shows that three 2017 International trucks were used by six drivers for a total of 44 days

over this timespan. (*Id*.). But (according to Defendant's records) Sneed was never assigned a 2017 truck, and four of the drivers who were assigned the 2017 trucks were white. (*Id*.). Finally, Defendant points to Qualcomm messages between Sneed and Defendant showing that Sneed asked to be paid out for the vacation time he had accrued. (Doc. No. 25 at 7 (citing Doc. No. 25-2 at ¶ 17)).[53] Based on this evidence, the Court finds that Defendant has shifted the burden to Sneed to show—by presenting "specific facts, as opposed to general allegations"—that he was treated less favorably than a comparator. *Viet v. Le,* 951 F.3d 818, 824 (6th Cir. 2020).

Sneed attempts to meet his burden by pointing to his deposition testimony contradicting the evidence Defendant has offered. Specifically, Sneed points to his testimony stating that (1) he saw white drivers go home earlier than him even though they were paid the same amount (*id*. at 90, 95-98, 136), (2) at least some white drivers were paid more than $180 per day, (*id*. at 150), (3) white employees were assigned more "desirable" routes[54] (*id*. at 146-47), and (4) he "felt [Defendant] would give the white people better trucks than they gave the blacks" (*id*. at 78).

The Court does not find Sneed's self-serving testimony sufficient to establish the fourth element of his *prima facie* case. To begin with, because Sneed's protected class is African American—as opposed to Black, importantly—the relevant comparators for him must be *non-African American*, which is not synonymous with being "white"; a person can be African American even if someone might characterize them as being "white" based on a subjective perception of how light-colored their skin may be. The undersigned is loath to say that a person cannot be African American—or otherwise have the heritage of African descent—merely because someone might

---

[53] Plaintiffs stipulated that Sneed requested that his accrued vacation time be paid out on his paycheck. (Doc. No. 32 at 12).

[54] By more "desirable" routes, Sneed means that the routes were shorter in distance. (Doc. No. 33-2 at 146-47).

characterize the person as "white." *See*, *e.g.,* Kimberly Jade Norwood, *The Virulence of Blackthink and How Its Threat of Ostracism Shackles Those Deemed Not Black Enough*, 93 Ky. L.J. 143, 198 (2005) (wherein Black author refers to "having met African-Americans who are White"). Indeed, someone can identify as African American and yet have genes that overwhelmingly are associated in the popular mind with being white; so, for example, someone could identify as African American and yet have genetic profile that is 70 percent Northern European and thus appear "white."   *See* Carl Zimmer, *White? Black? A Murky Distinction Grows Still Murkier,* N.Y. Times, https://www.nytimes.com/2014/12/25/science/23andme-genetic-ethnicity-study.html ("Americans with less than 28 percent African American ancestry say they are white, the researchers found. Above that threshold, people tended to describe themselves as African-American."). And a person can be ostensibly "white" and yet have enough African DNA that they may choose to identify as African American. *See* Tara Bahrampour, *They Consider Themselves White, But DNA Tests Told A More Complex Story,* Washington Post, https://www.washingtonpost.com/local/social-issues/they-considered-themselves-white-but-dna-tests-told-a-more-complex-story/2018/02/06/16215d1a-e181-11e7-8679-a9728984779c_story.html  (referring to the phenomenon of "a significant amount of African DNA show[ing] up in a presumably white person").[55] Absent clear authority requiring him to do so, the undersigned will not countenance the outdated and scientifically, sociologically, and evidentially unsound notion that being African American and being perceivable by a particular plaintiff as "white" are mutually exclusive.

---

[55] To be clear, the undersigned does not necessarily contend that any facts purported in these news articles are true or that the content of these articles is or ever should become part of the record in this case. Instead, the undersigned cites these stories merely to make the points that he is far from alone in perceiving "white" and "African American" as being not necessarily mutually exclusive and that this perception did not originate with him.

Sneed has done nothing to establish that the unidentified persons he reports (without any providing any relevant details or context) perceiving as "white" in fact are not African American. Thus, he has not shown that any of these persons are outside of his protected class—meaning that he has not established that they are valid comparators. Such a showing might not be difficult to make; a simple averment (by the alleged comparators themselves or by the plaintiff himself based on personal knowledge not excludable based on a hearsay objection) that the alleged comparators actually and specifically identify as being other than African American, or an admission by the defendant-employer, may suffice. But in the view of the undersigned, what will not suffice is the plaintiff's mere assertion that he has perceived unidentified people[56] to be "white" (and thus supposedly not African American), which is all Sneed has done.[57]

---

[56] As noted below, the only identification provided by Sneed of the alleged comparators is the names "Melvin" and "Chris," both of whom Sneed claims are white. Additionally, Sneed identifies a driver named "Jason" who Sneed claims is from "maybe Iran or Iraq"—a claim that leaves unaddressed whether "Jason" is white and additionally is too equivocal to be very probative of whether "Jason" in non-African American. (Doc. No. 33-2 at 67).

[57] Although Plaintiffs answered questions in their depositions about the treatment of non-African Americans (and gave answers suggesting the existence of preferential treatment for non-African Americans), the term never originated from Sneed himself, and originated from Smith only once (Doc. No. 33-1 at 55). Additionally, Plaintiffs never gave any indication that they were making any distinction between non-African Americans and "whites," nor did they indicate any basis of knowledge whatsoever for whether someone else is African American. As an example of the lack of personal knowledge as to any individual's race, when asked what race Chris and Melvin are, Sneed stated that they are "white." (Doc. No. 33-2 at 67). The Court does not dispute that civil rights statutes generally prohibit both discrimination based on color and discrimination based on race, and that color and race often are associated with each other. But discrimination based on color is distinct from discrimination based on race. *See, e.g.*, *Miller v. Bed, Bath & Beyond, Inc.*, 185 F. Supp. 2d 1253, 1261 (N.D. Ala. 2002) ("Section 1981, like Title VII, prohibits discrimination on the basis of color, as well as race."); *Walker v. Secretary of the Treasury*, 742 F. Supp. 670, 671 (N.D. Ga. 1990) ("[I]ntra-racial color discrimination claims are authorized by both title VII and existing Supreme Court precedent."). And because Plaintiffs have alleged discrimination based on race rather than on color, the Court is constrained to define the persons outside of Plaintiffs' protected class as persons who are not African American, and not as persons who are white in skin color.

The Court realizes that for purposes of anti-discrimination statutes, "white" has been recognized as a race and not just a color, albeit (regrettably) without articulating the sense in which "white" is a distinct race and not just a color. But even if by calling Chris and Melvin "white," Sneed meant to assert not merely that the *color* of their skin is white, but that they are "white" in *race* (and thus necessarily, non-African American)

And Sneed does not provide a basis to show that he has personal knowledge that the purported comparators are not African American (and thus fall outside his protected class). Throughout most of his deposition, Sneed uses vague terms to describe "white" employees that he believes received better treatment. (Doc. No. 33-2 at 95) ("I didn't think it was fair going to Horse Cave twice and not [sic] letting some of the white drivers only go once."); (*id*. at 98) ("[W]hy am I being asked to do two loads and the other white drivers are not?"); (*id*. at 125) ("[B]ut they wouldn't say anything to the white driver about it"); (*id*. at 126) ("I was seeing white drivers leave early while we was still working") (*id*. at 127) ("And they were making me work Saturdays, but not the white guys"). But Sneed provides no explanation for how he knows these unidentified employees were in fact not African American. In his deposition, Sneed also identified by name two drivers ("Melvin" and "Chris") that he believes are white. (*Id*. at 67). But as with the completely unidentified alleged comparators, Sneed offers no basis for knowing the race of either "Melvin" or "Chris."

Moreover, as to whether the alleged comparators were treated more favorably, Sneed's deposition testimony is entirely speculative, frequently based on hearsay, and often contradicted by his own testimony in the same deposition. For example, Sneed testified that other drivers (including Melvin and Chris) told Sneed they were paid for a full day even if they only worked a half day (*id*. at 136-37). But Sneed later admitted in his deposition, "I don't know if we were all getting paid the same, but it was about the same, I would imagine. I don't know for sure." (*Id*. at 136). Sneed also testified that he had "never seen anyone's check stub." (*Id.* at 150). With regard

---

Sneed offers no basis of personal knowledge for the assertion that Chris and Melvin are "white" in a racial sense. Nor does Plaintiff offer any other evidence to this effect.

It may not be difficult to provide adequate evidence that someone the plaintiff perceives as "white" is in fact "white" in a racial sense. But Plaintiffs simply have not done this.

to his assertion that he was treated differently because he was required to work on Saturdays, Sneed testified that Melvin and the other "white" workers never worked (and were not asked to work) on Saturdays, while Defendant "ma[de]" Sneed work Saturdays. (*Id*. at 127-29). However, the record shows that Sneed actually *requested* to work on several Saturdays. (Doc. No. 25-6). Furthermore, Sneed's only evidence that Melvin and the other "white" drivers were not asked to work on Saturdays is hearsay from those drivers and Sneed's testimony that he did not see them working on any of the Saturdays (eight in total) that he worked during his employment. (*Id*. at 129).

Sneed's assertion that "white" drivers were assigned "better" (i.e., shorter) routes is also unsupported by admissible evidence because his testimony supporting this assertion is based on hearsay and lacks a basis for personal knowledge. Sneed bases his assertion that "white" drivers were assigned "better" (i.e., shorter) routes solely on conversations he allegedly had with employees he says are white about where they were driving on a particular day. (*Id*. at 147). But Sneed does not even purport to have knowledge about how routes were assigned or the total distance driven (on average) by each driver. Moreover, Sneed admitted that "white" drivers were (like African American drivers) assigned routes to some of the more remote locations, such as Horse Cave, Kentucky. (*Id*. at 148). "It is not enough for [Sneed] to cite to deposition testimony containing only 'personal belief and speculation,' as mere citations to such testimony 'do not create genuine issues of material fact that may be used to defeat a motion for summary judgment.'" *Benitez*, 2022 WL 1283087 at *51 (quoting *Holleman v. BellSouth Telecommunications, Inc.*, No. 3:09-CV-311, 2011 WL 3876590, at *11 (E.D. Tenn. Sept. 1, 2011)); *see also Mitchell*, 964 F.2d at 585 (discounting a plaintiff's affidavit that consisted of "nothing more than rumors, conclusory allegations, and subjective beliefs which are wholly insufficient to establish a claim of discrimination as a matter of law").

Because Sneed lacks personal knowledge to support his contentions, and because he bases his testimony almost entirely on hearsay and/or subjective beliefs that are completely unsupported (and at times plainly contradicted by his own testimony), the Court may not consider the evidence on summary judgment. *See* Fed. R. Evid. 602; *Sperle v. Michigan Dep't of Corr*., 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." (citing *Weberg v. Franks*, 229 F.3d 514, 526 n. 13 (6th Cir. 2000))).

Finally, even if Sneed's testimony were not based on hearsay or unsupported by personal knowledge, nearly all of his testimony is contradicted by Defendant's records clearly refuting his claims. (Doc. No. 25-3, 25-4). And notably, in their Response, Plaintiffs do not even address (much less refute or even attempt to refute) the accuracy of Defendant's records with respect to the trucks[58] and routes assigned to each driver.[59] Even viewing the evidence in the light most favorable to Sneed as required, the Court simply cannot conclude that a reasonable jury would be able to find in favor of Sneed on the issue of whether a comparator was treated better than him. Having failed to present admissible evidence with nearly the required specificity on this point, Sneed cannot show the existence of a genuine issue of material fact as to the fourth element of his *prima facie* case, and Defendant is entitled to summary judgment on Sneed's race-discrimination claim.

---

[58] As to his claim that he was required to drive trucks older than the trucks driven by white employees, Sneed stated in his deposition that he has no reason to disagree with Defendant's records insofar as they show that he drove a 2018 Peterbilt truck. (Doc. No. 33-2 at 75-76).

[59] However, Plaintiffs do dispute the accuracy of the records of Qualcomm messages produced by Defendant. Specifically, Plaintiffs argue that the Qualcomm messages are incomplete and indecipherable. But as discussed below with respect to Sneed's retaliation claim, the undersigned finds (as did the Magistrate Judge) that Plaintiffs have not shown that the Qualcomm messages are incomplete or indecipherable.

Even if Sneed could raise a genuine issue of material fact as to his *prima facie* case of discrimination, he could not survive summary judgment on an indirect-evidence theory. Assuming arguendo that Sneed could establish the fourth element, the burden would then shift to Defendant to show a legitimate, non-discriminatory basis for terminating Sneed. Defendant satisfies this burden (of production) by pointing to Wright's declaration stating that Sneed was terminated for "refusing loads and/or refusing to work, a performance issue for which he had ready [sic] been counseled verbally and in writing." (Doc. No. 25-2 at ¶ 23). In support of this testimony, Defendant cites records of Qualcomm messages demonstrating that Sneed received a verbal warning on November 12, 2019 regarding his performance issues, followed by a written warning on November 22, 2019 for refusing to work. (Doc. No. 25-7). Defendant also points to Sneed's driver reviews in the weeks leading up to his termination, wherein Davis noted that Sneed again refused loads and informed Davis that he was too tired to complete his assigned trips. (Doc. No. 33-3 at 104). Davis also noted in Sneed's reviews that Sneed consistently stopped at truck stops on several occasions while dispatched on loads, resulting in his inability to complete his assigned trips in a timely manner. (*Id*.). Specifically, Davis stated on April 7, 2020, that

> Driver has no been up to par the last couple months on this lane. Driver has failed to pick up loads daily. Driver have left after been dispatched and went home on several occassions.. on 04/07/20 driver was told to take a trailer and get it unloaded and driver stopped at a truck stop and wasted hours. on 03/31/20 driver stopped at a truck stop from 13:45 and started clock back at 14:53 knowing he has two trips to make to horse cave which is 93 miles there and bak.. on 03/30/20 driver stopped at the truck stop 13:53 to 15:30 … after wasting time he couldnt make the next load so he went home. on 03/27 a conversation between the driver and driver manager occurred on the qualcom in which driver was stating he be tired. Driver manager advise him that if he is tired than he need to stay home due to safety reasons because we dont want him tired and driving. driver advise that he would still come tired and only due half work told driver stay home if he was tired. on 03/26 driver refused a load at 10:15 driver rejected a load on qualcom after reporting to work at 0730 because he was to tired to run. on 03/23 driver refused to clean out a trailer to get it loaded. the place he runs to dart in horse cave dont accept

trailers that is dirty in the inside and he is knowledgeable of this. driver refused to do so..

(*Id*.).

Nearly two weeks later, on the day Sneed was terminated, Davis wrote

On april 16.2020 driver sent several messages about a load he need to pick up.. driver was sent a truck that was bringing him an empty to the yard where he was located. driver had 6 hours on his clock to do the load. The load was in Clarksville Tn 37 miles from the yard and 37 miles back to the yard. Driver was given these instructions at 1453 and than reminded of what he was doing at 1502.. driver ignored all commands and proceed to go home without going to pick up all the load. driver has done this on several occassions.

(*Id*.).[60]

This production of evidence is sufficient to shift the burden back to Sneed to show, at step three of *McDonnell Douglas*, that Defendant's purportedly legitimate non-discriminatory reason for terminating Sneed was a pretext for discrimination based on his race. The specific issue regarding pretext is whether Sneed has pointed to evidence sufficient for a jury to find by a preponderance of the evidence *both* that Defendant's presumptively valid justification for terminating Sneed was in fact pretextual *and* that the real reason was discriminatory.[61]

---

[60] The Court here sets forth what Davis wrote verbatim, without including "sic" or making grammatical corrections in brackets.

[61] In seeking to demonstrate pretext, Sneed attempts to invoke the "cat's paw theory" of liability. (Doc. No. 31 at 14). "A plaintiff alleging liability under the cat's paw theory seeks 'to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.'" *Marshall v. Rawlings Company L.L.C.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). "Under this theory, the subordinate, not the nominal decisionmaker, is the driving force behind the employment action." *Roberts v. Principi*, 283 Fed. App'x. 325, 333 (6th Cir. 2008).

Sneed argues that Davis and Claytor—the two supervisors who (according to Sneed) subjected him to discrimination and harassment—were the driving force behind his termination, which the parties agree was ultimately executed by Luckett upon the recommendation of Davis and Claytor. Thus, Sneed argues, although he has not alleged that Luckett specifically discriminated against him, Defendant may still be held liable for discrimination under the cat's paw theory. While acknowledging that the cat's paw theory of liability is cognizable in Title VII cases, the Court does not see how such theory could help Sneed *demonstrate pretext* in this case. This is particularly true because, from what the Court can gather, Defendant has not asserted that it can avoid liability for discrimination on the particular grounds that the individual

As stated above, an employee can show pretext "by offering evidence that (1) the employer's stated reason [for taking the adverse employment action] had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd*, 766 F.3d at 590 (citing *Wexler*, 317 F.3d at 576). Sneed appears to employ the first approach in an attempt to establish that Defendant's purported reasons for terminating him—that he refused loads, refused to work, and exhibited other performance shortcomings even after a verbal and written warning—were pretextual. Specifically, Sneed argues that Defendant's purported reason lacks a basis in fact because it is belied by positive reviews he received from another Supervisor, Dinkins, just months before Sneed was terminated. These reviews include the following comments:

> February 10, 2020: "Reliable driver, no issues to report."
> February 24, 2020: "Driver continues to be a valuable asset to the TRR team."
> March 20, 2020: "[R]eliable driver; no issues to report."

(Doc. No. 33-3 at 104). Sneed points also to his deposition testimony stating that he "never had any complaints," "never had any write-ups," that "most [of] his loads got there on time," and that Defendant never formally disciplined him. (Doc. No. 33-2 at 131-32, 157-58, 160-63). Sneed argues that this evidence "suggests that [his] performance was not as dismal as Davis made it appear just days before his discharge." (Doc. No. 31 at 15).

Sneed's evidence is not sufficient to raise a genuine issue of fact as to pretext. In reaching this conclusion, the Court finds significant the sequence in which the various reviews and warnings mentioned above were given. Sneed received both a verbal warning and a written warning from Davis regarding his performance issues in late November of 2019. (Doc. No. 25-7). He then

---

who made the decision to terminate Sneed has not himself been accused of holding a discriminatory animus against Sneed.

received the positive reviews from Dinkins in February and March of 2020. (Doc. No 33-3 at 104). But the fact that he received positive reviews several months later does not change the fact that he previously had been warned about his poor performance. And after receiving these positive reviews, Sneed once again received a negative review from Davis describing performance shortfalls similar in nature to the shortfalls for which Sneed had previously received verbal and written warnings from Davis. (*Id.*). A positive review sandwiched between earlier and later negative reviews does not tend to suggest that termination after the later negative review is pretextual (particularly when the later negative review describes conduct consistent with the earlier negative review).

Sneed argues that Davis's negative review submitted on April 7, 2020 lacks credibility (and thus is pretextual) because it is contradicted by Dinkins's reviews submitted March and February of 2020. But the Court finds this argument unpersuasive for several reasons. The first reason again relates to timing. The last positive review Sneed received from Dinkins was submitted on March 20, 2020. Davis's April 7, 2020 review cited several dates—all of which postdate March 20, 2020—on which Sneed failed to adequately perform his job in one way or another. Thus, Davis's review does not contradict Dinkins's review. Rather, it is entirely possible that no performance issues—or at least none worth mentioning in a review—arose with Sneed after November 2019 and prior to March 20, 2020, resulting in Dinkins's positive reviews at that time; then, beginning on March 23, 2020 (which is the earliest date cited in Davis's April 7 review), Sneed again began to have performance-related issues, which ultimately—along with the multiple warnings he had previously received—formed the basis for his termination.

Furthermore, as Sneed acknowledged in his deposition, Davis was Sneed's direct supervisor with whom who he communicated every day. (Doc. No. 33-2 at 64). Dinkins, on the

other hand, "just sort of filled in and just helped out," according to Sneed. (*Id.* at 152). So Davis likely was in a better position than was Dinkins to accurately assess Sneed's performance. Therefore, the Court concludes that Dinkins's positive reviews are not sufficient to raise a genuine issue of fact as to whether Defendant's proffered reasons for terminating Sneed were the real reasons it did so at the time it did so.

Even if Sneed's evidence is sufficient to raise a genuine issue of fact as to whether Defendant's proffered reason was not the real reason for terminating Sneed, Sneed has not pointed to any evidence tending to show the second component of pretext, i.e., that the actual reason for his termination was discriminatory.[62] As indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *Ford Motor Co.*, 782 F.3d at 767 (citing *St. Mary's*, 509 U.S. at 515, and *Reeves*, 530 U.S. at 148). Sneed simply has not offered evidence sufficient to raise a genuine issue of fact as to whether the actual reason for his termination was discriminatory. In the absence of such evidence, Sneed cannot establish that a reasonable jury could conclude that Defendant's proffered reason for terminating him was pretextual. Defendant is therefore entitled to summary judgment as to Sneed's race-discrimination claim.

ii.    *Plaintiff Smith*

With respect to Smith, Defendant challenges the ability of Smith to prevail at step one of *McDonnell Douglas* because (according to Defendant) Smith cannot raise a genuine issue of fact

---

[62] Nor has Sneed argued (in order to establish the second component of pretext reasonably might do) that (or how) the same evidence that supports his position that Defendant's purported reason for terminating him is pretextual likewise shows that the actual reason for his termination was discriminatory.

as to the last two elements of an indirect-evidence *prima facie* case of race discrimination.[63] Specifically, Defendant challenges Smith's ability at step one to show that he (i) suffered an adverse employment action; and (ii) was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

The parties agree that Smith resigned from his employment with Defendant, and that when he did so, he had already accepted a job as a driver for another trucking company. However, the parties dispute the reason(s) why Smith resigned from Defendant. Defendant argues that Smith "left [Defendant] on his own accord for greener pastures" and, therefore, did not suffer an adverse employment action. (Doc. No. 25 at 14). Smith, however, claims that he was constructively

---

[63] Defendant also suggests that it should prevail at the second and third steps with respect to Smith. (*See* Doc. Nos. 25 at 17; 39 at 7). However, Defendant never clearly articulates a purportedly "legitimate, non-discriminatory" reason for taking the alleged adverse action (constructive discharge) against Smith, much less provide evidence to support that (unstated) reason. Defendant simply argues that Smith "left [Defendant] on his own accord for greener pastures." (Doc. No. 25 at 14). This argument is relevant to the inquiry of whether Smith has raised a genuine question of fact as to whether he was constructively discharged—a matter the Court considers herein—but not the distinct question of whether Defendant had a "legitimate, non-discriminatory reason" for constructively discharging Smith.

The Court recognizes the predicament in which Defendant finds itself in seeking to meet its burden at the second step under these circumstances. Speaking candidly, Smith places himself in a strong position in the latter stages of the indirect-evidence framework by claiming that his constructive discharge was the adverse employment action forming the basis for his retaliation claim. After all, the Court would have been skeptical of any assertion that Defendant had a legitimate, non-discriminatory reason for doing something (constructively discharging Smith) Defendant denies even having done. And indeed it is not clear that Defendant has made such an assertion. If Defendant had made such an assertion, it would have been cognizable but likely unpersuasive.

Indeed, the Court wonders how a defendant-employer could ever have a legitimate reason for constructively discharging an employee, inasmuch as a constructive discharge by definition is neither legitimate (being by definition the result of "intolerable discriminatory conduct," as discussed below) nor the kind of action for which an employer provides any reason (since it involves the employee leaving, rather than the employer overtly demanding that the employee leave for some reason given by the employer). Yet, as the undersigned has previously noted, case law suggests that courts allow a Title VII defendant to deny that a constructive discharge took place while alternatively asserting that there was a legitimate reason for doing so. *See Benitez*, 2022 WL 1283087, at *56, n.113 (discussing the unique situation wherein a defendant might take these "alternative, and ostensibly inconsistent, positions").

Nevertheless, because Defendant prevails at step one, the Court need not reach step two (or step three) in order to conclude that Defendant is entitled to summary judgment with respect to Smith's claim for retaliation.

discharged from Defendant because of the racial discrimination, harassment, and intolerable working conditions he allegedly suffered while working for Defendant. (Doc. No. 31 at 12). Smith claims that his alleged constructive discharge constitutes an adverse employment action for purposes of the third element of his *prima facie* case of employment discrimination.[64]

As the Sixth Circuit has acknowledged, "[a] constructive-discharge claim 'has two basic elements': (1) an employer must engage in such intolerable discriminatory conduct that a reasonable person would feel compelled to resign and (2) the employee must actually resign." *Everly v. Everly*, 958 F.3d 442, 463 (6th Cir. 2020) (quoting *Green v. Brennan*, 578 U.S. 547, 136 (2016)).[65] It follows that constructive discharge occurs only if the intolerable conduct constitutes *discriminatory conduct* in violation of Title VII. *See Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 682 (6th Cir. 2005) ("The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." (quoting *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999))). This means, among other things, that harassing conduct (including comments) counts towards a showing of intolerable conditions only to the extent that the conduct is based on a discriminatory motive or animus. *See Rickard v. Swedish Match N. Am., Inc.*, No. 3:12-CV-00057 KGB, 2013 WL 12099414, at *10 (E.D. Ark. Nov. 25,

---

[64] Defendant does not dispute that a constructive discharge constitutes an adverse employment action. And the Sixth Circuit has clearly stated that it does. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001). However, Defendant disputes that Smith's resignation—and the circumstances surrounding his resignation—amount to a constructive discharge.

[65] This standard runs contrary to the Sixth Circuit's previous rule under which a plaintiff claiming constructive discharge was required to show: 1) that the employer created working conditions that are intolerable from a reasonable person's point of view, and 2) that the employer did so with the intent of forcing the employee to quit. *See, e.g., Logan*, 259 F.3d at 568. As the undersigned has previously noted, the newer rule as stated in *Everly* "is to the substantial advantage of any plaintiff who did resign, as it eliminates the need for such plaintiff to make the difficult showing that the employer intended to force the plaintiff to quit." *Benitez*, 2022 WL 1283087, at *48.

2013), *aff'd*, 773 F.3d 181 (8th Cir. 2014) ("To begin, the Court considers only those statements based on age and sex, as determined above, in its constructive discharge analysis. This is because an alleged constructive discharge is not illegal unless achieved through harassment based on a discriminatory animus . . .").

Seeking to refute that Smith suffered any adverse employment action (and in particular a constructive discharge), Defendant points to Smith's deposition testimony stating that he voluntarily left Defendant (Doc. No. 33-1 at 58-59), and that when he did so, he had already accepted a job at another company. (*Id.* at 80).[66] This supports Defendant's position that Smith did not suffer an adverse employment action in the form of constructive discharge, but instead resigned in pursuit of different (and perhaps better) job prospects. Therefore, Defendant has shifted the burden on summary judgment to Smith on the issue of whether he suffered an adverse employment action.

To meet this burden, Smith seeks to establish that he was compelled to resign because of the intolerable and discriminatory conditions allegedly created by Defendant, and therefore was constructively discharged. (Doc. No. 31 at 12-13). Relevant to this issue, the Sixth Circuit has noted:

> Whether a reasonable person would have feel [sic] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job

---

[66] Defendant points also to evidence showing that approximately five months after accepting the above-referenced job for a competitor, Smith left that job for a "better" job (at yet another competitor) where he now earns approximately $65,000 a year as a local driver—40% more than he earned while working for Defendant. (Doc. No. 25 at 10 (citing Doc. No. 33-1 at 82)). The Court does not find this evidence probative of whether Smith was constructively discharged by Defendant, because Smith did not know (at least as far as the Court or Defendant are aware) at the time he resigned that he would ultimately end up at a different job (that is, different from the one for which he left Defendant) where he would receive considerably higher pay. And if Defendant here is inviting the Court to infer from this evidence that Smith is just the kind of person that moves from one job to another in search of better opportunities, the Court declines the invitation. Moreover, Defendant has not pointed to any evidence showing that the initial job for which Smith left Defendant offered (compared to his job with Defendant) significantly better conditions or higher pay.

responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 568 (quoting *Brown v. Bunge Corp*., 207 F.3d 776, 782 (5th Cir. 2000) (alterations omitted)).

Smith argues that his constructive discharge is based in part on a reduction in pay that he claims he suffered. (Doc. No. 31 at 12). But Smith has not pointed to any evidence supporting the notion that his pay (in absolute terms) was reduced during his employment with Defendant.[67] To the contrary, Smith admitted in his deposition that he was paid $180 per day (regardless of how many hours he worked) throughout his entire employment with Defendant. (Doc. No. 33-1 at 53). However, Smith argues that even though his pay (in absolute terms) was not reduced, he suffered a reduction in pay *relative to his peers* because he allegedly worked more hours and drove longer routes than did non-African American drivers who (according to Smith) received the same pay ($180 per day). (Doc. No. 31 at 12 (citing Doc. No. 33-1 at 46; 72-73)).[68] While this argument may be relevant to the fourth element of Smith's indirect-evidence *prima facie* case of race discrimination, Smith has offered no authority supporting the notion that Smith's relative-pay-reduction argument is applicable to the *Logan* factor of reduction in salary; having a lower salary than others in one thing, but having *one's own salary reduced* (the clear focus of this *Logan* factor) is quite another. Moreover, Smith's assertion that non-African American drivers received the same

---

[67] As previously noted, Smith worked for Defendant for just under six months. Given his relatively short duration of employment with Defendant, Smith cannot claim (at least not convincingly) that because his pay stayed the same rather than increase, he effectively suffered a material loss in pay when inflation is factored in.

[68] Smith provides no basis for personal knowledge supporting his assertion that other employees received the same pay, regardless of the number of hours they worked.

pay for driving shorter routes and working less hours is (like Sneed's) based entirely on unsubstantiated hearsay. When asked in his deposition how he knew that "white drivers"[69] were assigned "better" (i.e., shorter) routes, Smith stated:

> They would tell me. And also, you would know by the time you get back, they'd be gone, so. They'd say, yeah, I got off yesterday at 11 o'clock, you know. They're like – we'd just be within passing talking, so.

(Doc. No. 33-1 at 69). When prompted, Smith could not recall the names of any of the "white drivers" with whom he allegedly spoke about this topic, (*id.*) and admitted that he did not know how routes were assigned. (*Id.* at 71). Moreover, Smith has not pointed to any evidence showing that he has personal knowledge about the amount of pay non-African American drivers received. Smith's speculation and reliance on hearsay simply do not demonstrate personal knowledge on these issues and do not create a genuine issue of material fact that may be used to defeat a motion for summary judgment. *See Benitez*, 2022 WL 1283087, at *51.

The only other factor from *Logan* that Smith has argued as a basis for his alleged constructive discharge is the sixth factor: "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Logan*, 259 F.3d at 569. Courts have suggested that constructive discharge can be found by the presence of this factor alone. *See e.g., Logan*, 259 F.3d at 569 (noting that the factors are "relevant[ ] singly or in combination"); *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 640 (6th Cir. 2010) (discussing only the "badgering, harassment, or humiliation" factor); *Bender v. Gen. Dynamics Land Sys., Inc.*, No. 2:19-CV-13177, 2020 WL 4366049, at *5 (E.D. Mich. July 30, 2020) ("[T]here is precedent for finding constructive

---

[69] Like Sneed (as discussed above), Smith needs to point to comparators that the Court has a basis to find are not *African American* (his asserted protected class), and Smith fails to do so by merely pointing to persons he allegedly perceives to be "white." And like Sneed, Smith has failed to show a basis for personal knowledge (or any other evidence) that these purported comparators, whom he has perceived to be "white," are not African American.

discharge where an employee is subjected to 'badgering, harassment, or humiliation' by a coworker so intolerable that it moves the employee to resign."). But it has been said, not without reason, that "[t]he occurrence of one of these factors in isolation . . . generally is insufficient to support a finding of 'intolerable working conditions.'" *See Gosbin v. Jefferson Cty. Commissioners*, No. 2:14-CV-2640, 2017 WL 5653503, at *10 (S.D. Ohio Mar. 29, 2017), *aff'd*, 725 F. App'x 377 (6th Cir. 2018). And the Sixth Circuit has rejected a claim of constructive discharge at the summary judgment stage where the "[p]laintiff's evidence of harassment and disparaging comments were isolated to only few incidents and by a few individuals and were not pervasive enough to significantly alter [the plaintiff's] working conditions." *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012). Thus, "'badgering, harassment, and humiliation' alone can effectuate a constructive discharge, but it must be pervasive enough to significantly alter the plaintiff's working conditions." *Jemison v. AFIMAC Glob.*, 645 F. Supp. 3d 781, 800 (N.D. Ohio 2022). This notion—that "badgering, harassment, and humiliation" alone can effectuate a constructive discharge only when it is "pervasive enough to significantly alter a plaintiff's working conditions"—is analogous to the analysis applied to claims of hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.") (internal quotation marks and citations omitted); *Cleveland*, 491 F. App'x at 707 (noting that when evaluating a claim for hostile work environment, Sixth Circuit courts "consider the totality of circumstances to determine whether the alleged conduct is sufficiently severe or pervasive."). The Sixth Circuit has previously recognized the considerable overlap between the respective inquiries relevant to constructive discharge based on harassment

and a claim of hostile work environment. For example, in *Plautz v. Potter*, 156 F. App'x 812 (6th Cir. 2005), the Sixth Court stated that "workplace harassment that is severe and pervasive enough to create a hostile work environment may in some circumstances constructively discharge the employee." *Id.* at 819. In comparing these inquiries, courts within the Sixth Circuit have observed that "the bar for proving constructive discharge is higher than that for a hostile work environment claim." *Cooper v. Jackson-Madison Cnty. Gen. Hosp. Dist.*, 742 F. Supp. 2d 941, 957 (W.D. Tenn. 2010); *see also Plautz*, 156 F. App'x. at 819 ("We have already decided that the complained of actions do not rise to the level of creating a hostile work environment, and therefore they necessarily do not rise to the level of compelling a reasonable person to resign."); *see also Collette*, 126 F. App'x at 682 ("[T]he fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also."); *Hollar v. RJ Coffey Cup, LLC*, 505 F. Supp. 2d 439, 453 (N.D. Ohio 2007) ("That [the plaintiff] may proceed on her hostile work environment claim is, in itself, insufficient to prove constructive discharge." (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999))).

Based on the above, the Court finds it appropriate to consider Sixth Circuit case law analyzing claims for hostile work environment—and the principles set forth in those cases—to aid the Court's evaluation of whether Smith has shown evidence of harassment "pervasive enough to significantly alter [his] working conditions," so as to compel his resignation. But in conducting its analysis, the Court bears in mind the Sixth Circuit's teaching that the standard for constructive discharge based on harassment is more burdensome than the standard for the existence of a hostile work environment.[70]

---

[70] It is only sensible that a plaintiff seeking to show that he was constructively discharged based on harassment ought to meet a higher standard that a plaintiff seeking to show he suffered harassment sufficient to create a hostile work environment. After all, a plaintiff claiming that the employer created a hostile work

Smith argues that he was "continuously subjected to badgering, harassment, and humiliation by his supervisors . . . including repeatedly calling him 'monkey ass' and cussing, screaming, criticizing, and belittling him while not treating non-African American drivers this way."[71] (Doc. No. 31 at 12). As evidence of this behavior, Smith points to his own deposition in which he testified that Davis and Claytor used the term "monkey ass" when referring to both him and Sneed. (Doc. No. 33-1 at 46-47, 54, 56, 79, 95).[72] Additionally, Smith relies on his deposition testimony that Davis and Claytor belittled him by their "tone of voice,"[73] and by making comments such as "why you ain't getting this done," "[y]ou should be able to get it done[,]" "you should be more . . . productive." (*Id*. at 54). Smith claims that when he heard Davis and Claytor speak with

---

environment (or allowed one to exist) must show that the conditions (in this case, the harassment) that he suffered were so severe and pervasive that they altered his working conditions. By contrast, a plaintiff claiming that he was constructively discharged (based solely on harassment) must show that the harassment was so pervasive and severe that it not only affected his working conditions, but also *compelled* him to resign because continuing to work under such conditions would simply be intolerable.

[71] Smith's phrasing here is both apt and illustrative of a key point the Court has made above: the persons outside of his (and Sneed's) protected class are "non-African American drivers," not necessarily "white drivers." And, as noted above, even if Plaintiffs' use of "white" referred not just to the purported comparators' skin color, but to their race, Plaintiffs have offered no evidence (such as testimony from Plaintiff(s) based on personal knowledge, a declaration or deposition testimony from the purported comparators themselves, or an admission from Defendant) that those individuals are in fact white in race (i.e., non-African American).

[72] Defendant denies that any of its employees ever referred to Smith (or, for that matter, Sneed) as "monkey ass."

[73] Smith described what he meant by "tone of voice" as follows:

> I've heard [Davis and Claytor] – like a previous conversation with other drivers on the yard, how they talk to them versus how they talk to myself, so. They'll mostly ask, can you do this? They'll more so tell me I had to do it. If I don't do it, I don't get paid full pay or, you know, get sent home without no pay. So stuff like that.

(Doc. No. 33-1 at 47-48). Smith also stated elsewhere that Davis would speak to African American employees with "[m]ore of a forceful [tone], more of a, you need to do this. Not asking or, will you please, or you know, like not professional, and with slang." (*Id*. at 56). Smith could not provide any examples of the "slang" Davis allegedly used other than "monkey ass." (*Id*.).

non-African American drivers, they spoke "more professional[ly] and how it should be done." (*Id*. at 55).

Smith also asserts that he felt compelled to resign because management was unwilling to respond to (or investigate) the harassment he allegedly suffered even after he reported it. (Doc. No. 31 at 13). In support of this contention, Smith points to his deposition testimony that he notified Brown "under five" times about the name-calling and racial discrimination[74] to which he was allegedly subjected and the longer routes that he was allegedly assigned. (Doc. No. 33-1 at 45-47; 76-77).[75] According to Smith, Brown stated that those things "shouldn't be going on" and that he would "check into it," but (Smith contends) nothing was ever done. (*Id*. at 77-78). Smith also testified that on numerous occasions he asked Davis (over the phone) for better or shorter routes (*id*. at 69-70) and complained to Davis about having to work more hours than other drivers (*id*. at 74), to which Davis replied (according to Smith), "just do the job," and "if you don't got it, maybe you need to, you know, find another job." (*Id*.).

With respect to Smith's testimony describing Davis and Claytor's "belittling" tone, the Court does not see how using a "more forceful" tone, or demanding (rather than asking, i.e., truly *requesting*) an employee to do something, could lead a reasonable person to feel compelled to resign. Similarly, with respect to the "belittling" comments Smith asserts that Davis and Claytor

---

[74] When asked to state the specific complaints he allegedly made to Brown, Smith stated:

> The -- of the actual work load nobody else was getting outside of the African Americans. The longer day we was receiving. It's equal to me, less pay. Because we're getting the same amount, 180, you're working 4 hours, I'm working 10. It means he's making an hour more than me. The actual quote-unquote "name calling." Like the -- he used the monkey -- monkey [ass].

(Doc. No. 33-1 at 46-47). Smith also testified that he complained to Brown about the "tone of voice" in which Brown and Claytor allegedly spoke to him.

[75] In his deposition testimony, Smith did not state when he complained to Brown or how much time had elapsed between his alleged complaints to Brown and his resignation.

made essentially questioning Smith's productivity—while perhaps bothersome to Smith—are not enough to lead a reasonable person in Smith's position to feel *compelled* to resign. To the contrary, Smith's testimony regarding Davis and Claytor's tone and comments speaks primarily to Smith's personal perceptions or feelings about their treatment toward him. Moreover, Smith's assertions about Davis and Claytor's criticism of his job performance are, standing alone, too vague and generalized to demonstrate any discrimination. *Stewart v. Esper*, 815 F. App'x 8, 18 (6th Cir. 2020) (finding allegations insufficient where plaintiff's failure to "point to any specific acts" meant claims were "too generalized and vague"); *E.E.O.C. v. Spitzer Mgmt*., 866 F. Supp. 2d 851, 857–58 (N.D. Ohio 2012) (granting summary judgment on Title VII hostile work environment claim where plaintiff "could only recall in vague terms the specific words utilized" by management). Smith simply has not shown that these "belittling" comments (or the tone with which they were made) rise to the level of creating conditions so intolerable that a reasonable person would have felt compelled to resign. And even if Smith had made this showing, he has not shown that it was based on a discriminatory motive or animus.

The Court likewise finds that Davis's and Claytor's alleged references to Smith as "monkey ass," although perhaps unprofessional and understandably unwelcome, are insufficient to show that working conditions were so intolerable that a reasonable person would have felt compelled to resign. These comments amount to "mere offensive utterances," which "are not actionable under Title VII." *Goldfaden v. Wyeth Labs., Inc*., 2010 WL 2011310, at *13 (E.D. Mich. May 19, 2010) (citing *Harris v. Forklift Sys*., 510 U.S. 17, 21 (1993)). "Even where multiple utterances occur, the Sixth Circuit has rejected constructive discharge claims at summary judgment where the plaintiff's 'evidence of harassment and disparaging comments were isolated to only a few incidents and by a few individuals and were not pervasive enough to significantly alter [the plaintiff's] working

conditions.'" *Batchelor v. Brilliance Sch.*, No. 1:22-CV-01049-PAB, 2023 WL 8004713, at *6 (N.D. Ohio Nov. 17, 2023) (quoting *Cleveland*, 491 F. App'x at 708). Smith does not point to any evidence that Davis and/or Claytor called him a "monkey ass" on a regular basis.[76] Instead, Smith's deposition testimony regarding Davis and Claytor's apparent use of "monkey ass" is entirely vague. (Doc. No. 33-1 at 46-47, 54, 56) (Doc. No. 33-2 at 153-55). Smith provides no detail whatsoever about when the term was used, how frequently it was used (except that it was used more than once), where he was at the time it was used, or who else may have been around to hear it. The Court simply cannot see how any reasonable jury could conclude from Smith's vague testimony about the comments made by Davis and Claytor that such comments were "pervasive enough to significantly alter [Smith's] working conditions." *Cleveland*, 491 F. App'x at 708. Smith's testimony is "too equivocal, conclusory, and lacking in relevant detail to create a genuine dispute of material fact under Rule 56." *Viet*, 951 F.3d at 824 (internal quotations omitted).

Moreover, although the use of the term "monkey ass" conceivably could be intended to be derogatory toward African Americans, any discriminatory animus motivating Defendant's alleged use of "monkey ass" can be drawn—if at all—only by inference. For example, the Sixth Circuit has found that a manager's use of the term "monkey" to refer to a black employee was not motivated by impermissible bias. *See Ejikeme v. Violet*, 307 F. App'x 944, 949 (6th Cir. 2009). In *Ejikeme*, the Sixth Circuit held that, even assuming arguendo that the defendant's use of "monkey" to refer to the employee was racially motivated, it was not sufficient to create a hostile work

---

[76] If anything, the record suggests that the comment "monkey ass" was not used frequently. Sneed testified that "I remember one time [Davis] was just basically like, look, you're going to get your monkey A-S-S out there and do the job . . . ." (Doc. No. 33-2 at 153). Elsewhere, however, both Sneed's and Smith's testimony suggests that the term was used on at least more than one occasion (though it is unclear how frequently). Construing all inferences in favor of Plaintiffs, as it must, the Court will not read Sneed's testimony to mean that the term "monkey ass" was used by Defendant on just one occasion. But neither will the Court assume (without evidence in the record) that "monkey ass" was persistently used by Defendant.

environment. And as explained above, the standard for establishing the existence of a hostile work environment is even lower than the standard for establishing a constructive discharge. Here, applying a more onerous standard than the one required to establish a claim of hostile work environment, the Court sees (and Plaintiffs have suggested) no reason why the Court should draw a different conclusion than the Court in *Ejikeme* with regard to Defendant's employees' alleged use of "monkey ass." This is particularly true given that Davis—one of the two individuals that Smith claims called him "monkey ass"—was himself African American and that neither Plaintiff has pointed to any evidence establishing that Davis and Claytor used the term "monkey ass" to refer only to African American employees.[77]

The Court finds that Smith has not met his burden to establish a genuine question of fact as to whether Defendant's employees' use of the term "monkey ass" constituted harassment and humiliation strong enough to *compel* resignation. Smith has therefore failed to raise a genuine issue of fact as to the third element of his indirect-evidence *prima facie* case of race-discrimination.

---

[77] Plaintiffs assert that non-African American employees were not referred to as "monkey ass" (Doc. No. 31 at 12 (citing Doc. No. 33-1 at 46-47, 53-56, 76, 78, 95)). But the portions of Smith's deposition testimony that Plaintiffs cite in their Response as supporting this assertion state only that Davis and Claytor spoke to Plaintiffs using a different "tone" than the tone they used when speaking to employees of "a different race," (Doc. No. 33-1 at 54-55, 76), and that Smith "felt" that Davis and Claytor were "harsher" on him than they were on "white" employees. (*Id*. at 78). Plaintiffs do not offer any evidence whatsoever actually supporting the notion that Davis and Claytor used the term "monkey ass" to refer only to African American employees. Indeed, it would be difficult for Plaintiffs to even make such a showing given that neither Plaintiff has established that he had personal knowledge necessary to support such a contention. For starters, it stands to reason that Plaintiffs were not within earshot of every conversation that these persons had with either Davis or Claytor. And Sneed, for his part, admitted in his deposition that he never saw any Qualcomm messages or heard conversations between Davis or Claytor and another driver of Defendant. (Doc. No. 33-2 at 153, 155). Although Smith testified that he overheard conversations between Davis and other drivers who were non-African American, and that Smith heard Davis speak to non-African American drivers "more professional and how it should be done," (Doc. No. 33-1 at 55), Smith has not established a basis for personal knowledge about the race of the individuals that he overheard speaking with Davis. Accordingly, Plaintiffs have not pointed to admissible evidence suggesting that Davis and/or Claytor's alleged use of the term "monkey ass" was motivated by discriminatory animus.

Even if Smith could successfully establish the third element of his *prima facie* case (i.e., that he suffered an adverse employment action in the form of constructive discharge), Smith cannot satisfy the fourth element. To establish the fourth element of an indirect-evidence *prima facie* case of discrimination, a plaintiff must show that he was replaced by a person outside the protected class or was treated less favorably than a comparator. As it did with respect to Sneed, Defendant meets its initial burden of showing an absence of evidence to establish that Smith was not replaced by a person outside his protected class by pointing to Wright's declaration, wherein Wright states that Defendant did not hire anyone specifically to replace Plaintiffs, (Doc. No. 25-2 at ¶ 27), and its responses to Plaintiffs' interrogatories for the same point. (Doc. No. 20-1 at 11). In response, Smith takes the same approach that Sneed did by arguing that because Wright—as Defendant's Rule 30(b)(6) witness—testified that she "d[id] not know" who replaced Smith (or, for that matter, Sneed) (Doc. No. 33-4 at 55), Smith has somehow established that he was replaced by a person outside his protected class. But for the same reasons that the Court rejected this argument with respect to Sneed, the Court likewise rejects it with respect to Smith and therefore concludes that Smith cannot establish the fourth element of his *prima facie* case by showing that Smith was replaced by someone outside his protected class.

However, as noted above, there is another avenue by which a plaintiff may establish the fourth element: by showing that he or she was treated less favorably than a comparator (i.e., a similarly situated individual outside his protected class). To succeed under this approach, a plaintiff is "required to prove that all of the relevant aspects of [his] employment situation were 'nearly identical' to those of the [comparator's]." *Ercegovich,* 154 F.3d at 352 (quoting *Pierce*, 40 F.3d at 802). "Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same

standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.

Seeking to show that Smith cannot establish that he was treated less favorably than a comparator, Defendant points—as it did with Sneed—to Wright's declaration stating that all Whites Creek TRR drivers were assigned similar routes and, on average, a similar number of loads per day during Smith's employment. (Doc. No. 25 at 7) (citing Doc. No. 25-2 at ¶ 15). Defendant points also to route records consistent with Wright's testimony. (Doc. Nos. 25-3; 25-4). Thus, Defendant has shifted the burden to Smith to offer evidence showing that he was treated less favorably than a comparator.

To meet this burden, Smith relies on evidence similar to that on which Sneed relied in his attempt to establish the fourth element of his *prima facie* case. That is, Smith points to his deposition testimony stating that he was assigned "less desirable"[78] routes than white employees (Doc. No. 33-1 at 68-69) and had to work longer hours than white employees (*id.* at 72-73). Smith testified also that he had to drive older[79] trucks than white employees. (*Id.* at 36-37, 64-65, 72).

For multiple reasons, the Court does not find this evidence sufficient for Smith to raise a genuine issue of fact as to the fourth element of his *prima facie* case. First, Smith has not identified a specific comparator. Rather, Smith uses vague terms to describe "white" and "non-African

---

[78] By "less desirable" routes, Smith (like Sneed) means that the routes were longer in distance and involved longer wait times for pick up and drop off. (Doc. No. 33-1 at 68).

[79] By "older," Smith means that the trucks were older in age and had more miles on them (Doc. No. 33-1 at 37).

American"[80] employees that he believes received better treatment in various ways. (*Id*. at 69) ("The white drivers [had the better or shorter routes]"); (*Id*. at 63) (testifying that African American employees were assigned older trucks than were "non-African American employees"); (*Id*. at 68) (testifying that he had to work more hours and less desirable routes than "non-African American" employees) (*Id*. at 71) (testifying that it was "very rare" that "non-African American drivers" out of the Whites Creek facility had to take the longer routes that he took). However, Smith (like Sneed) does not establish any basis for knowing whether any of the unidentified drivers to which he refers were in fact non-African American. Nor does Smith pinpoint (in either the Response or his testimony) any specific individuals outside of his protected class that he claims were treated better than him.

Even if Smith had established that the unspecified individuals to which he refers were in fact non-African American, Smith does not establish that the circumstances of employment of those individuals make them similarly situated in all material respects to Smith. Beyond identifying the purported comparators as "drivers" working for the same company, Smith has not pointed to any evidence showing that they were similarly situated in all material respects to Smith. Smith has not offered evidence showing, for example, that those drivers worked under the same supervisor, were subject to the same standards, and/or had the same level of experience. "Courts regularly dismiss claims when a plaintiff fails to point to another employee that was similarly situated . . . ." *Jordan v. Mathews Nissan, Inc.*, 539 F. Supp. 3d 848 (M.D. Tenn. 2021); *Bullion v. Ford Motor Co*., 60 F. Supp. 2d 765, 771 (M.D. Tenn. 1999) ("Plaintiff, on the other hand, has

_____

[80] As noted above, Plaintiffs answered questions in their depositions about the treatment of non-African Americans, but Sneed himself never used the term "non-African American" and Smith used it only once (Doc. No. 33-1 at 55). Moreover, Smith did not give any indication that he was drawing a distinction between "whites" and "non-African Americans" and offers no basis for knowledge that any individuals are in fact non-African American.

come forward with nothing other than her bald allegations to support her contention that comparable male employees were treated more favorably than she was. Plaintiff has not named any comparable male employee who was favored over her."); *Pruitt v. CHSPSC, LLC*, No. 3:17-CV-01048, 2018 WL 4300182, at *11 (M.D. Tenn. Sept. 10, 2018) (dismissing claim for disparate pay when the plaintiff produced no similarly situated employees). Thus, Smith has failed to identify a specific comparator.

Even if Smith had identified a proper comparator, Smith's testimony still falls short of providing a reasonable jury with sufficient evidence to make a finding that he was treated less favorably than the purported comparator. Like Sneed, Smith has not established personal knowledge necessary to support the contentions made in his deposition (the only evidence on which he relies). For example, Smith claims that he was given older trucks than non-African American employees, but in his deposition, he acknowledged that he did not even know the year of the trucks he was driving. (Doc. No. 33-1 at 37). Moreover, Smith did not provide any evidence to suggest that he knew the year of the trucks driven by "white" or "non-African American" employees. Rather, Smith asserted that he could tell "just from the eye test" that the trucks he was assigned were older models than the trucks assigned to white employees. (*Id*. at 63-64). And even if Smith did have sufficient personal knowledge to support his claim that he was assigned older trucks, his self-serving testimony is squarely contradicted by Defendant's records. (Doc. Nos. 25-3, 25-4). As Wright notes in her declaration, Defendant's records show that all Whites Creek drivers drove the same truck (2018 Peterbilt) during the vast majority of the time that Smith was employed by Defendant. (Doc. No. 25-2 (citing Doc. Nos. 25-3, 25-4)). Two 2019 Peterbilt trucks were driven for a total of seven days during the time Smith was employed, but neither one was driven by a white employee. (Doc. Nos. 25-3, 25-4). Moreover, the record shows that three 2017

International trucks were used by six drivers for a total of 44 days over this timespan. (*Id*.). But Smith drove this model only one day, whereas four other drivers who were assigned the 2017 trucks were all white. (*Id*.).

Smith testified also that he was assigned "less desirable" (i.e., longer) routes than white employees and required to work longer hours than white employees. (Doc. No. 33-1 at 68). But his basis for these assertions is purely speculative and based on hearsay. Smith stated that he knew he drove longer routes and worked longer hours than white employees because white drivers told him "within [sic] passing" that they finished work earlier. (*Id*. at 69). When asked, Smith could not recall the name of any white employee who allegedly shared such information. (*Id*.). Additionally, Smith (like Sneed) provided no basis for personal knowledge that the unspecified "white" drivers to which he referred were in fact *non-African American* (which is what matters, as noted above).

Smith's conclusory and unsubstantiated testimony—based on hearsay and lacking a basis for personal knowledge—simply cannot overcome the route records Defendants have produced showing that all White Creeks Drivers drove similar routes and were assigned a similar number of loads per day on average during Smith's employment with Defendant. (*See* Doc. Nos. 25-3, 25-4). To the extent that his testimony is even admissible, it is at best "a mere scintilla of evidence," which is insufficient to defeat summary judgment. *Anderson*, 477 U.S. at 252. Thus, Smith cannot raise a genuine issue of fact as to whether a similarly situated employee outside of his protected class was treated better than he was.

Smith has therefore failed to establish both the third and fourth elements of his *prima facie* case under the indirect-evidence framework. Because Smith has not pointed to evidence from which a reasonable jury could find that Smith has established a *prima facie* case of discrimination, Defendant is entitled to summary judgment on Smith's Title VII race-discrimination claim.

II.  <u>Retaliation</u>

A.  Retaliation Generally

In addition to their claims of discrimination, Plaintiffs each assert a claim of retaliation.[81] Title VII makes it unlawful to retaliate against employees for engaging in protected conduct. *See* 42 U.S.C. § 2000e-3(a). Both retaliation and discriminatory termination are subject to the *McDonnell Douglas* framework if there is no direct evidence of retaliation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Thus, a plaintiff "'may prove [subject to the defendant's rebuttal as to why it took the adverse employment action(s)] unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework.'" *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)).[82]

"In order to establish a[n indirect-evidence] prima facie case of retaliation under Title VII, an employee must establish that (1) he or she engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (citing *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000)). The Sixth Circuit has noted that "the burden of establishing a prima facie case of retaliation is not onerous[.]" *Hatchett*, 186 F. App'x at 550 (internal quotation marks and citation omitted). Contributing to such

---

[81] Sneed brings his claim for retaliation (like his other claims) pursuant to Title VII, § 1981, and the THRA. Having filed no timely EEOC charge, Smith brings his claims pursuant to § 1981 only (which is not implicated by the EEOC process).

[82] As noted above, Plaintiffs argued that they have presented direct evidence of general discrimination—a position with which the Court disagrees for the reasons stated above. However, Plaintiffs make no argument that they have presented direct evidence of retaliation. Accordingly, the Court addresses Plaintiffs' retaliation claims only under the indirect-evidence *McDonnell Douglas* framework.

lack of onerousness is the relatively broad notion of "adverse employment action" in the context

of retaliation claims in particular. *See Niswander*, 529 F.3d at 720 ("In contrast to Title VII's

discrimination provision, the 'adverse employment action' requirement in the retaliation context

is not limited to an employer's actions that affect the terms, conditions, or status of employment,

or those acts that occur in the workplace. The retaliation provision instead protects employees from

conduct that would have dissuaded a reasonable worker from making or supporting a charge of

discrimination.") (citation and internal quotation marks omitted).

Protected activity includes opposing any practice made unlawful by Title VII, or making a

charge or testifying, assisting or participating in any manner in an investigation, proceeding, or

hearing under Title VII. 28 U.S.C. § 2000e-3(a). Reporting or complaining to management of racist

conduct also constitutes protected conduct. *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram,

Inc.*, No. 3:14 C 02325, 2016 WL 2927983, at *8 (M.D. Tenn. May 19, 2016) (collecting cases).

The Sixth Circuit has previously explained what is required to establish causation for

purposes of an indirect-evidence *prima facie* case:

> To prove causation in a Title VII retaliation case, a plaintiff must show that
> the employee's protected activity was a "but for" cause of the employer's adverse
> action against her, meaning the adverse action would not have occurred absent the
> employer's desire to retaliate. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,
> 352, 360, 133 S. Ct. 2517, 186 L.Ed.2d 503 (2013). In other words, "a plaintiff must
> produce sufficient evidence from which an inference could be drawn that the
> adverse action would not have been taken had the plaintiff not filed a discrimination
> action" or otherwise engaged in protected activity. *Nguyen v. City of Cleveland*, 229
> F.3d 559, 563 (6th Cir. 2000). At the prima facie stage, this burden "is not onerous,"
> and can be met through "evidence that defendant treated the plaintiff differently
> from similarly situated employees or that the adverse action was taken shortly after
> the plaintiff's exercise of protected rights." *Id.*

*George v. Youngstown State Univ.*, 966 F.3d 446, 459–60 (6th Cir. 2020). "[T]he plaintiffs must,

among other things, show 'a causal link' between a protected activity and the adverse employment

action. That is, the evidence 'must be sufficient to raise an inference that the protected activity,'

such as complaining to management about racial harassment, 'was the likely reason for the adverse action.'" *Fite v. Comtide Nashville, LLC*, 686 F. Supp. 2d 735, 753 (M.D. Tenn. 2010) (quoting *Wade v. Knoxville Utils, Bd*., 259 F.3d 452, 463 (6th Cir. 2001)). Or, to put it only slightly differently, "[t]o establish a causal connection between the protected activity and the adverse employment action, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected activity." *Hatchett*, 186 F. App'x at 550. Or to put it yet another way,

> In order to establish such a causal connection, a plaintiff must show some type of retaliatory intent. [The plaintiff] therefore had to establish that the true motivation for [the adverse employment action(s)] were not for the reasons given, but were instead based on the fact that he [engaged in protected conduct].

*Tennial v. United Parcel Serv., Inc*., 840 F.3d 292, 308 (6th Cir. 2016).

"The burden of proof at the [indirect-evidence] prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). What this means is that the real battle regarding causation often will occur not at the *prima facie* case (first) stage, but rather at the latter two stages. As noted above, the Court does not perceive (and Plaintiffs have not asserted) that Plaintiffs have pointed to anything that constitutes direct evidence of retaliation, and so it examines only whether Plaintiffs' retaliation claims survive under an indirect-evidence theory.

### B. Plaintiffs' Retaliation Claims

The only protected activity in which Plaintiffs claim they engaged (and were retaliated against for engaging in) was opposing and reporting Davis and Claytor's discriminatory comments and treatment of them. (Doc. No. 31 at 21). As discussed below, Defendant argues that Plaintiffs

have not pointed to any evidence showing that they actually reported any discriminatory conduct, or that Defendant knew such conduct had occurred. Regarding the nature of the alleged retaliation (the various adverse employment actions), Sneed claims that he was terminated, and Smith claims that he was constructively discharged.[83] With respect to Sneed, the Court explained above that he has at least raised a genuine issue of fact as to whether his termination constituted an adverse employment action for purposes of his discrimination claim, and his termination likewise meets that adverse-action element for his retaliation claim. Smith, by contrast, is unable (for reasons discussed above) to raise a genuine issue of fact as to whether he was constructively discharged. And even assuming arguendo that Smith could show that he was constructively discharged—or that he was subjected to some other adverse employment action sufficient to satisfy the third element of his indirect-evidence *prima facie* retaliation case—Smith would still be unable to establish a *prima facie case* for retaliation because (for reasons discussed below) he cannot raise a genuine issue of fact as to the second element.

Defendant claims that Plaintiffs cannot establish the first or second element of their *prima facie* case of retaliation because (according to Defendant) "there is simply no evidence establishing that Plaintiffs ever opposed, reported, and/or complained to anyone at PAM that they were being racially discriminated against." (Doc. No. 25 at 16).[84] Below, the Court assesses (with respect to

---

[83] Plaintiffs also argue that they were subjected "to disparate treatment that directly impacted their income." (Doc. No. 31 at 22). Plaintiffs do not elaborate on this assertion beyond their general (and unsupported) allegations made with respect to their discrimination claim that they were required to work longer hours than their counterparts for the same pay, thus resulting in a lower pay-to-work ratio. But because Sneed's termination is sufficient to satisfy the adverse action element, and the Court assumes arguendo that Smith has likewise satisfied the adverse-action element of a retaliation claim, the Court need not decide whether this vague assertion is sufficient to constitute an adverse action for purposes of their retaliation claim.

[84] Defendant does not dispute that reporting or complaining of racist conduct to management constitutes protected activity. And indeed, it does. *See Pendleton*, 2016 WL 2927983, at *8. Rather, Defendant asserts that neither Plaintiff can show evidence that he actually reported to management any racially discriminatory conduct.

each Plaintiff) whether Defendant has shifted the burden to each Plaintiff as to the first and second elements, and, if so, whether each Plaintiff can satisfy his burden to raise a genuine issue of fact as to those elements. But before turning to the relevant evidence and arguments presented by the parties, the Court must expand upon and make an important distinction between what is (and is not) required to satisfy the first element and what is required to satisfy the second element of a *prima facie* retaliation case.

To satisfy the first element of a *prima facie* retaliation case, an employee is not required to report discriminatory conduct to any *particular* individual (for example, an employee in human resources, a supervisor, or the company's president). Title VII's anti-retaliation provision states that "it shall be an unlawful employment practice for an employer to discriminate against any . . . employee[ ] . . . because [the employee] opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e–3(a). The Sixth Circuit has endorsed a broad interpretation (adopted by the EEOC) of "opposing" conduct as "including complaining to anyone (management, unions, *other employees*, or newspapers) about allegedly unlawful practices." *Johnson*, 215 F.3d at 579, 580 n.8 (emphasis added).[85] So based on this broad definition of "opposing" conduct for Title VII, a plaintiff could establish that he engaged in protected activity by showing that he reported harassing or discriminatory conduct to *any* employee (and even to non-employees).

_____

[85] In *Johnson*, the Sixth Circuit further clarified this point:

> In short, the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable. Of critical import here is the fact that there is no qualification on who the individual doing the complaining may be or on the party to whom the complaint is made known—i.e., the complaint may be made by anyone and it may be made to a co-worker, newspaper reporter, or anyone else about alleged discrimination against oneself or others[.]

215 F.3d at 580.

However, a plaintiff *cannot* satisfy the second element of his or her *prima facie* retaliation case (i.e., that the defendant *knew* that the plaintiff engaged in protected activity), by simply showing that *any* employee (or non-employee) knew that he or she engaged in protected activity. Rather, a plaintiff seeking to satisfy the second element must "produce evidence sufficient to establish that *the individuals charged with taking the adverse employment action* knew of the protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (emphasis added). This point is illustrated in *Fenton v. HiSAN, Inc.*, 174 F.3d 827 (6th Cir. 1999). There, the adverse action was the transfer of the plaintiff (Fenton) to the "B" shift. *Id*. at 832. The court in *Fenton* held that Fenton could satisfy the first element of retaliation by pointing to conversations she had with another employee's (but not her own) supervisor (Rice) about harassment she suffered from a co-worker. *Id*. at 830-32. However, Fenton's conversations with Rice were *not* sufficient to meet the second element of Fenton's *prima facie* case of retaliation, because Rice was not the individual who made the decision to transfer Fenton to the B shift. *Id*. at 832. The Sixth Circuit court observed:

> Although Fenton met with Rice and Don Turner, Rice's supervisor and the plant superintendent, she is unable to produce any evidence that the relevant management decision-makers who moved her to the "B" shift—Rebecca Shenk and John Miller—knew of her complaints . . . when they decided to transfer her. Shenk testified that she was not informed of plaintiff's complaints until.... October 7, 1996 [four days after Fenton was informed of her transfer]. According to Miller's testimony, he and Shenk decided either on September 30 or October 1, 1996, that plaintiff . . . was to be transferred to the "B" shift. . . . Therefore, . . . [plaintiff] has not met her burden of showing that her protected activity was known *to those who made that decision*.

*Id*. (emphasis added). Similarly, in *Mulhall*, the Sixth Circuit affirmed the district court's conclusion that the plaintiff could not establish the second element of his retaliation claim because the plaintiff "failed to produce evidence sufficient to establish that *the officials taking the adverse employment action* knew of his protected activity." 287 F.3d at 554 (emphasis added); *see also*

*E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1069, n.4 (6th Cir. 2015) (discussing whether the "relevant decision makers" knew that the plaintiff engaged in a protected activity when they terminated his employment).

The upshot of these cases is that a plaintiff seeking to survive summary judgment for a retaliation claim may satisfy the second element of his or her *prima facie* case only by producing evidence from which a reasonable jury could conclude that the decision-maker ultimately responsible for taking (or instructing someone else to take) the adverse employment action against the plaintiff knew that the plaintiff engaged in protected activity.

This means that Plaintiffs can establish the first element of their *prima facie* retaliation case simply by showing that they reported or complained to any employee about the harassment they allegedly suffered from Davis and Claytor. However, this evidence alone will not satisfy the second element. Rather, Plaintiffs must point to evidence sufficient to raise a genuine question of fact as to whether the decision-maker ultimately responsible for taking the adverse action(s) against them (here, Davis, Claytor, and—in Sneed's case only—Luckett), knew that Plaintiffs reported the discriminatory and harassing conduct. With this in mind, the Court assesses below each Plaintiff's ability to make this showing.[86]

### i. *Plaintiff Sneed*

Defendant claims that Sneed cannot establish the first or second element of his *prima facie* case of retaliation because "there is simply no evidence establishing that Plaintiffs ever opposed, reported, and/or complained to anyone at PAM that they were being racially discriminated against." (Doc. No. 25 at 16). In support of this, Defendant points to Sneed's Qualcomm message

---

[86] Despite the Court's phrasing in this sentence, the Court is aware that a Plaintiff need not make any showing as to an any aspect of his *prima facie* case unless and until Defendant shifts the burden to that Plaintiff to make a showing.

history,[87] which does not show any instance in which Sneed complained that he was discriminated against because of his race. (*Id*.). This evidence is hardly conclusive of whether Sneed engaged in protective conduct, but (especially since Defendant need not entirely "prove a negative" to shift the burden) it is sufficient to shift the burden to Sneed to show that he can establish the first element of his indirect-evidence *prima facie* case of retaliation.

To meet this burden, Sneed must point to evidence from which a reasonable jury could conclude that Sneed reported or complained to *anyone* about racist comments and/or racial discrimination he allegedly endured. Sneed attempts to satisfy this burden by pointing to his deposition wherein he testified that he complained to Davis, Claytor, Luckett, and Coatney that he felt he was being discriminated against based on his race, (Doc. No. 33-2 at 95-98, 103-04, 108, 174-77), and to Davis and Claytor that he was assigned older trucks than were white employees. (Doc. No. 33-2 at 148-49). Sneed also pointed to his testimony that he complained to Davis and Coatney during his training that he felt that he did not receive the same level of attention during the training that white employees received. (*Id*. at 141-142).

Self-serving statements can be credible under certain circumstances, but it should be viewed with caution when entirely uncorroborated. *See Johnson v. Buddy's Bar-B-Q, Inc*., No. 1:13-CV-254, 2015 WL 1954454, at *5 (E.D. Tenn. Apr. 29, 2015) ("The Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported by additional evidence."). Here, Sneed's testimony that he complained to individuals working for

---

[87] The Magistrate Judge ordered Defendant to produce, consistent with Plaintiff's discovery requests "all documents, notes, and emails created or maintained by each Plaintiff's former supervisor(s) . . . , including but not limited to all Qualcomm messages related to the facts and claims in this case." (Doc. No. 22 at 9). Additionally, the Magistrate Judge ordered Defendant to produce information and documents—including any Qualcomm communications—related to complaints Plaintiffs made to defendant about, among other things, race discrimination or harassment. (*Id*. at 4).

Defendant is completely unsupported by any documentary evidence. Not only that, but much of Sneed's testimony is contradicted by his own testimony and other evidence in the record. Sneed has not pointed to a single message in the Qualcomm records showing that he communicated with any of his supervisors about conduct that might conceivably constitute racial discrimination. Although Sneed stated in his deposition that at times he communicated with his superiors by phone, (Doc. No. 33-2 at 109-110), he also stated that "for the most part, all communication was done by the Qualcomm." (Doc. No. 33-2 at 100). And with respect to communications he had with Davis, Sneed stated that he communicated with Davis *only* through Qualcomm. (*Id*. at 98). So while it is possible that *all* of Sneed's complaints could have been communicated via phone, the Court does not find credible Sneed's self-serving testimony to that effect—particularly where Sneed admitted that the majority of communications with management (and *all* of his communications with Davis) were made via Qualcomm (thus making it extremely unlikely that *all* of his alleged complaints were made via the few phone conversations he claims he had but has no record to support). After all, if *all* of Sneed's communications with Davis occurred via Qualcomm, and at least *some* of his complaints were made to Davis, one would expect that at least one complaint would appear in the Qualcomm records. But that is not the case.

Plaintiffs attempt to explain this inconsistency (unpersuasively) by asserting that the Qualcomm messages produced by Defendant are incomplete and/or indecipherable. Specifically, Plaintiffs maintain that Defendant's production of Qualcomm messages is missing written complaints submitted by Sneed to Defendant (or, in the alternative, that such messages are indecipherable in the documents produced by Defendant). (Doc. No. 31 at 23). The Magistrate Judge previously rejected this argument, finding instead that Defendant's production of Qualcomm messages was responsive to Plaintiffs' requests for such information and that Plaintiffs failed to

demonstrate the existence of "missing" relevant messages (i.e., complaints by Sneed to Defendant). (*See* Doc. No. 30 at 2-3). Specifically, the Magistrate Judge reasoned:

> Sneed cannot – or at least has not – identified specific dates of any such messages or demonstrated that he maintained or requested contemporaneous copies of such messages. Given the importance of the kind of complaints that Sneed purportedly made, it is simply not credible for Sneed not to have maintained any information about the timing or substance of the complaints from which to track the reconstructed Qualcomm records. Defendant has produced available records of Qualcomm messages and the additional production requested by Plaintiffs is neither required nor warranted under applicable discovery rules or the Court's prior order.

> Further, if, as Sneed contends, he made complaints of race discrimination through Qualcomm, Plaintiffs could have, at any time during the discovery period in this case, subpoenaed the messages directly from Qualcomm. But Plaintiffs made no such effort. Now, Plaintiffs contend that Defendant should be ordered to communicate with Qualcomm and obtain an address to which Plaintiffs may direct a subpoena for the Qualcomm communications at Defendant's expense. (Docket No. 29-1 at 3.) There is no authority for that kind of extraordinary discovery request. Defendant is not obligated to conduct Plaintiffs' discovery for them. Nor is Defendant obligated to prove Plaintiffs' case, which is effectively the substance of Plaintiffs' demand that Defendant produce some more information that Plaintiffs (or at least, Sneed) contend exists.

> Apparently, the contact person at Qualcomm has not responded to overtures by Plaintiffs' counsel. But Defendant bears no responsibility for Qualcomm's lack of response. A simple online search for "Qualcomm" results in a host of information about Qualcomm's management team (including general counsel) and headquarters address, information that Plaintiffs' counsel could easily have obtained on their own. Plaintiffs offer no explanation for why they made no effort to obtain this information and at least attempt service of a subpoena duces tecum prior to or during the six weeks since the April 1 discovery conference. Instead, Plaintiffs seek to shift blame to Defendant for the perceived stonewalling by the Qualcomm contact. The Court declines to impose responsibility on Defendant for Plaintiffs' failure to seek the requested information directly from Qualcomm. And the Court again reiterates that Sneed's failure to keep documentation that is the core of his claims or to more timely obtain that information directly from Qualcomm is a dilemma for which the Court has no remedy.

(*Id.* at 2-4) (footnotes omitted).

The undersigned concurs with the Magistrate Judge that there is no valid basis from which a factfinder could reasonably conclude that written complaints by Sneed are (conveniently, for

Sneed) missing from Defendant's production of Qualcomm messages. Moreover, if such messages truly existed and were missing from Defendant's records, Plaintiff would have had every incentive to maintain documentation of those messages at the time they were sent[88] or to obtain those messages directly from Qualcomm during this litigation.[89] But as the Magistrate Judge noted, Sneed made no effort to do either of these things, instead insisting that Defendant has concealed (either intentionally or unintentionally) the existence of such messages. Ultimately, "[Sneed's] unsupported (and self-serving) testimony effectively amounts to a mere scintilla of (entirely uncorroborated) evidence. And a mere scintilla of evidence will not suffice to prevent summary judgment." *Masters Ent. Grp., Inc. v. Aurich*, No. 3:18-CV-01314, 2022 WL 2137090, at *20 (M.D. Tenn. June 14, 2022) (citing *Babcock & Wilcox Co. v. Cormetech, Inc.,* 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence . . . to a material fact is insufficient to forestall summary judgment.")).

Because Sneed cannot establish the first element of his *prima facie* case, Defendant is entitled to summary judgment on Sneed's retaliation claim.[90]

---

[88] As the Magistrate Judge also noted, it is particularly reasonable to expect Sneed to have documented his alleged complaints to Defendant given that this is Sneed's fifth lawsuit filed against a former employer for race discrimination, retaliation, and/or hostile work environment since 2007. *See Pearsall, et al., v. TT of Antioch d/b/a Nashville Dodge*, No. 3:07-cv-341; *Sneed v. Hickory Hollow Acquisitions*, No. 3:08-cv-00398; *Clay et al v. Gary Mathews Motors, LLC et al*., No. 3:13-cv-01017; and, *Sneed v. United Insurance Company of America*, No. 3:17-cv-01481.

[89] Plaintiffs filed a subpoena issued to Qualcomm and Omnitracs on June 8, 2022 (Doc. Nos. 34-35) wherein Plaintiffs requested all Qualcomm communications made between Plaintiffs and Defendant during Plaintiffs' employment. Nearly two years since filing those subpoenas have elapsed, yet Plaintiffs have offered no indication as to whether they received additional Qualcomm messages that might support Sneed's testimony.

[90] Even if Sneed could establish a *prima facie* case of retaliation, Defendant would succeed in showing a legitimate non-discriminatory reason for terminating him, and Sneed could not raise a genuine issue of fact as to the second component of pretext, for the same reasons discussed above with respect to his discrimination claim. Thus, Defendant is entitled to summary judgment on Sneed's retaliation claim regardless of Sneed's ability (or inability) to make out his indirect-evidence *prima facie* case.

ii.    *Plaintiff Smith*

As to Smith's retaliation claim, Defendant asserts (like it does with respect to Sneed) that

Smith cannot establish the first or second elements of his *prima facie* case of retaliation because

"there is simply no evidence establishing that [Smith] ever opposed, reported, and/or complained

to anyone at PAM that they were being racially discriminated against." (Doc. No. 25 at 16). In

support of this assertion, Defendant points to Smith's deposition testimony stating that he received

and "looked over" a copy of Defendant's Manual which included Defendant's Anti-Discrimination

Policy and Open-Door Policy. (*Id*. at 9 (citing Doc. No. 33-1 at 90-92)). Defendant also cites

Smith's deposition wherein Smith acknowledges that, per the Policies, he could have reported any

discriminatory conduct to Defendant's human resources department or president but chose not to

do so. (*Id*.). Finally, Defendant points to Smith's admission that the only person to whom he

complained about the alleged harassment and discrimination he suffered was Brown. (*Id*.). This is

sufficient to shift the burden to Smith to show that he can establish the first and second element of

his indirect-evidence *prima facie* case of retaliation.

Smith seeks to meet this burden by pointing to his deposition testimony stating that he

complained on several occasions to Brown about what he perceived to be racially discriminatory

treatment.[91] (Doc. No. 31 at 21 (citing Doc. No. 33-1 at 45-47; 76-77)). As noted above, Smith can

show that he engaged in protected activity by reporting harassing/discriminatory conduct to any

employee, including Brown. Therefore, it is immaterial whether Brown possessed managerial or

---

[91] With respect to Smith's purported complaints about discrimination, (unlike Sneed's) Defendant does not
(and cannot) point to the absence of complaints included in the Qualcomm records as evidence that Smith
did not actually engage in a protected activity because (unlike Sneed) Smith testified that he never
complained over Qualcomm (or sent any messages over Qualcomm). (Doc. No. 33-1 at 40-41, 49, 70).
Rather, Smith (unlike Sneed) maintains that *all* of his communications with supervisors (including his
complaints that constitute protected activities for purposes of his retaliation claim) were made via phone.
(Doc. No. 33-1 at 40-41, 44, 64, 70, 74-77).

supervisory authority. Similarly, Smith's admission that he did not report any discriminatory conduct to Defendant's human resources department or president (in light of Smith's knowledge that he could do so per the Policies) does not affect his ability to satisfy the first element. The Court finds that Smith's testimony that he notified Brown of the discriminatory/harassing conduct that he allegedly suffered is sufficient to raise a genuine issue of material fact as to the first element of his indirect-evidence *prima facie* case of retaliation.[92]

Smith's testimony that he reported discriminatory/harassing conduct to Brown is *not* sufficient, however, to raise a genuine question of fact as to the second element of his *prima facie* retaliation case. As noted above, a plaintiff seeking to satisfy that element must establish that the decision-maker ultimately responsible for taking (or instructing someone else to take) the adverse employment action against the plaintiff knew that the plaintiff engaged in protected activity. Here, Davis and Claytor (not Brown) are the individuals alleged to have taken the adverse employment action that forms the basis for Smith's retaliation claim (constructive discharge). Therefore, Smith must show that Davis and Claytor (as opposed to Brown) knew that Smith had engaged in protected activity, i.e., the reporting of their allegedly harassing and discriminatory conduct. But Smith has not produced any evidence supporting this showing. To the contrary, Smith admitted in his deposition that Brown was the only person to whom he reported the harassment and discrimination he allegedly suffered. (Doc. No. 33-1 at 49). And Smith has not pointed to any evidence suggesting that Brown informed anyone else about Smith's alleged complaints.

Moreover, even assuming arguendo that (as Plaintiffs argue) Brown had managerial or supervisory authority, Brown's having such authority would not change the outcome. As explained

---

[92] Notably, Smith's admission that he did not report any discriminatory conduct to Defendant's human resources department or president despite knowing that he could do so per the Policies does not impair his ability to satisfy the first element, because as noted above that element does not require the reporting to be to any particular individual.

by *Fenton*, it is not enough that someone with supervisory authority knew that the plaintiff engaged in the protected activity; instead, such knowledge must be possessed by the decision-maker ultimately responsible for taking the adverse employment action. Here, there is no indication that Brown was the decision-maker as to any adverse action.

Because Smith has not offered evidence from which a reasonable jury could conclude that the individuals ultimately responsible for taking the adverse employment action against him knew that he engaged in protected activity, Smith cannot establish the second element of his indirect-evidence *prima facie* retaliation case. Defendant is therefore entitled to summary judgment on Smith's retaliation claim.

III.   Hostile Work Environment

Each Plaintiff also brings a claim of hostile work environment. To succeed on his claim of hostile work environment, each Plaintiff must establish that: (1) he is a member of a protected class; (2) he was subjected to unwelcomed racial harassment; (3) the harassment was based on race; (4) the harassment created a hostile work environment; and (5) the existence of employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).[93] To constitute a Title VII violation, the harassment must be both objectively and subjectively offensive. *Harris,* 510 U.S. at 21–22. And to be actionable, the harassment creating the hostile work environment must be extreme. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 786–87 (1998). Title VII is not a "general civility code," and so "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are insufficient to support a claim

---

[93] There is an affirmative defense available to a defendant when they have taken reasonable care to prevent and to correct harassment and the plaintiff did not avail themselves of the employer's procedures to address harassment. *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 452 (6th Cir. 2004). Although Defendant asserts this defense, the Court need not reach the merits of the defense because the Court concludes that Plaintiffs have failed to establish the third and fourth elements.

of hostile work environment (even if it is based on a protected classification). *Id*. at 788 (internal quotation marks omitted).

"A court determines whether a hostile work environment has been created 'by looking at all the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Bradley v. Arwood*, 705 F. App'x 411, 422 (6th Cir. 2017) (quoting *Harris*, 510 U.S. at 23). "Whether conduct is severe or pervasive is 'quintessentially a question of fact.'" *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (quoting *O'Shea v. Yellow Tech. Servs., Inc*., 185 F.3d 1093, 1098 (10th Cir. 1999)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris*, 510 U.S. at 21 (internal quotation marks and citations omitted). "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *CSX Transp*., 643 F.3d at 512 (quoting *Faragher*, 524 U.S. at 788). "Thus, occasional offensive utterances do not rise to the level required to create a hostile work environment because, '[t]o hold otherwise would risk changing Title VII into a code of workplace civility.'" *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (quoting *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)).

Plaintiffs rely on two categories of "harassment" for their hostile work environment claims: (i) they were paid less (relative to the amount of work completed) than their non-African American counterparts, and (ii) Davis and Claytor spoke to them in a "hostile and abusive manner," by "cuss[ing], scream[ing], criticiz[ing], belittl[ing], talk[ing] down to, and threaten[ing]" them, as well as referring to each of them as "monkey ass." (Doc. No. 31 at 18).

The Court rejects Plaintiffs' first purported basis for their claims of hostile work environment because it is not the type of conduct that can even count toward the finding of a hostile work environment. As the undersigned has previously observed:

> A hostile work environment is created by conduct—namely, "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris*, 510 U.S. at 21). That is to say, it is the sufficient accumulation of this sort of conduct that eventually amounts to a hostile work environment. And it is this sort of conduct—to repeat, *discriminatory intimidation, ridicule, and insult*—that contributes to a finding of a hostile work environment. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009) ("[H]ostile-work-environment claims 'involve[ ] repeated conduct' and require the plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult [.]").
>
> To put the matter somewhat differently, acts that contribute towards of [sic] a finding of a hostile work environment are acts of *harassment*. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (noting that hostile work environment claims by "[t]heir very nature involve[ ] repeated conduct," and indicating that they require "repeated . . . harassment" and that "a single act of harassment may not be actionable on its own"). Hostile work environment claims are about harassment; this applies to hostile work environment claims based on race just as it applies to hostile work environment based on sexual harassment. *See id.* at 116 n. 10; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986) (referring repeatedly to a hostile work environment, including but not limited to ones involving sexual harassment, in terms of an environment of "harassment")[.]
>
> And, as noted above, this means harassment in the sense of intimidation, ridicule, and insult (and the like). Many kinds of actions suffered by employees simply do not fit this description. In particular, actual *employment-related* actions taken by an employer against an employee (negative though they may be for an employee) do not fit that description. *Cf., Haley v. Clarksville-Montgomery Cnty. Sch. Sys.*, 353 F. Supp. 3d 724, 735 (M.D. Tenn. 2018) (drawing a distinction between (a) actions that would support a claim of hostile work environment subject to the below-discussed plaintiff-friendly limitations analysis of *Morgan*, and (b) "'discrete acts' related to [the plaintiff's] employment."). This is because employment-related actions (whether or not they are illegally discriminatory or otherwise wrongful) are not in the nature of harassment in the form of intimidation, ridicule, or insult.
>
> …

Of course, a plaintiff could always claim to have felt "harassed"—or, more specifically, "intimidated" or "insulted"—by an employment-related action that the plaintiff perceives as negative towards him or her. But that is simply not the kind of harassment, intimidation or ridicule that contributes towards a hostile work environment.

*Ogbonna-McGruder v. Austin Peay State Univ.*, No. 3:21-CV-00506, 2023 WL 3572891, at *8-10 (M.D. Tenn. May 19, 2023), *aff'd*, 91 F.4th 833 (6th Cir. 2024) (footnotes omitted). Plaintiffs' allegations that they received less pay than their non-African American counterparts simply do not constitute *harassment* (intimidation, ridicule, insult, and the like). Accordingly, the Court disregards those allegations when evaluating whether Defendant's conduct created a hostile work environment.

That leaves, as the basis for their hostile work environment claim, Plaintiffs' allegations that Davis and Claytor spoke to them in an abusive manner, including by using profanity, screaming, belittling, and threatening them, and by referring to them as "monkey ass."[94] Defendant attacks both the third and fourth elements of Plaintiffs' claims of hostile work environment by arguing that even if Plaintiffs could show that they were harassed, they cannot show that such

---

[94] Because this conduct is the same conduct that formed the basis for Smith's alleged constructive discharge, the arguments made regarding the third and fourth elements of Plaintiffs' claim for hostile work environment are almost identical to those discussed above in relation to Smith's alleged constructive discharge. And because the Court's analysis of Smith's constructive discharge involved case law contemplating claims of hostile work environment, the Court's analysis with respect to Plaintiffs' claim of hostile work environment likewise looks quite similar to its analysis of Smith's constructive discharge. However, the Court bears in mind an important principle noted above—that "the bar for proving constructive discharge is higher than that for a hostile work environment claim." *Cooper*, 742 F. Supp. 2d at 957. Thus, the Court's earlier conclusion that Smith cannot establish a genuine question of fact as to whether he was constructively discharged based on the harassment he allegedly suffered does not necessarily preclude a finding that Plaintiffs have raised a genuine question of fact as to whether Defendant created a hostile work environment. Accordingly, the Court conducts its analysis of Plaintiffs' claims for hostile work environment below, bearing in mind that at least some of this analysis has already been explained above with respect to the alleged constructive discharge.

harassment was (a) based on their race, or (b) severe or pervasive enough to create a hostile work environment. (Doc. No. 25 at 18-19).[95]

Where a defendant challenges both the third and fourth elements of a claim of hostile work environment, a court should first determine what harassment was based on a plaintiff's race, and then ask whether that harassment in its totality was sufficiently severe or pervasive to create a jury question on this element. *CSX Transp.*, 643 F.3d at 511. "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace. Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *Id*. (internal citations omitted).

Putting aside for the moment Defendant's alleged use of "monkey ass" (which the Court discusses below), Plaintiffs have not pointed to evidence from which a reasonable jury could conclude that Davis and Claytor's alleged "cuss[ing], scream[ing], criticiz[ing], belittl[ing], talk[ing] down to, and threaten[ing comments]" was based on Plaintiffs' race. As evidence that Defendant spoke to Plaintiffs in a "hostile and abusive manner," Plaintiffs rely on their depositions. (Doc. No. 31 at 18). Specifically, Plaintiffs point to Smith's testimony stating that Davis belittled him by his "tone of voice," and by making comments such as "why you ain't getting this done," "[y]ou should be able to get it done[,]" "you should be more . . . productive." (*Id*. at 54). Plaintiffs point also to Sneed's testimony stating that Davis and Claytor "criticized" and "belittled [Plaintiffs] because . . . we was [sic] black." (Doc. No. 33-2 at 125). Additionally, Sneed testified that Davis threatened to "write [him] up" if Sneed did not get his "monkey A-S-S out there and do the job,"

---

[95] Defendant also argues that Plaintiffs cannot establish the fifth element (Defendant's liability) for any hostile work environment that may have existed. (*Id*. at 19). However, because Plaintiffs are unable to raise a genuine issue of fact as to the third and fourth elements, the Court need not (and does not) assess the fifth element.

and that Claytor used "cuss words and harsh language" such as "F-U-C-K" and "I need another load out of your ass." (*Id*. at 153-154). With the possible exception of reference to the use of "monkey ass," this testimony clearly does not include "direct evidence of the use of race-specific and derogatory terms." *CSX Transp.*, 643 F.3d at 511. As noted in *CSX Transp.*, a plaintiff may alternatively establish the third element by pointing to "comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id*. Plaintiffs seek to make this showing by pointing to Smith's testimony that when he heard Davis speak with non-African American drivers, Davis spoke "more professional[ly] and how it should be done," (*Id*. at 55). Plaintiffs also rely on Sneed's testimony that "[Davis and Claytor] would criticize me on something, but they wouldn't say anything to the white driver about it." (Doc. No. 33-2 at 125). As discussed above, however, Plaintiffs lack personal knowledge to support their testimony that Davis and Claytor did not speak to members of other races in the abusive manner in which they spoke to Plaintiffs. Sneed admitted in his deposition that he never heard conversations or saw any Qualcomm messages between Davis or Claytor and another driver. (Doc. No. 33-2 at 153-155). Rather, Sneed's purported basis for his statement that "white" drivers were not criticized for the same conduct was simply that "[the white drivers] never mentioned it [to him]." (*Id*. at 126).[96] And while Smith testified that he overheard conversations between Davis and other "non-African American" drivers, and that Davis spoke to non-African American drivers "more professional[ly] and how it should be done," (Doc. No. 33-1 at 55), Smith has not established a basis for personal knowledge about the race of the individuals that he overheard speaking with Davis. Accordingly,

---

[96] Sneed also stated that the white drivers "never had any complaints." (*Id*. at 126). When asked how he knew that Sneed replied, "I never - - I actually don't, but I never heard any complaints from them." (*Id*.). He also admitted that he did not know whether Defendant also asked white drivers why their work took so long. (*Id*.).

Plaintiffs have not pointed to any *admissible* evidence showing that Davis and Claytor treated non-African American drivers differently than they treated Plaintiffs with respect to their tone. Therefore, even if it is true that Davis and Claytor spoke to Plaintiffs in a "hostile and abusive manner," Plaintiffs have not raised a genuine issue of fact as to whether such conduct was based on Plaintiffs' race.

Plaintiffs' assertion that Davis and Claytor referred to them as "monkey ass" also fails to meet the third element. The term "monkey ass" is not "direct evidence of the use of race-specific and derogatory terms" because (as discussed above with respect to Smith's asserted constructive discharge) one would have to infer that the term is racially motivated. And even if such an inference is reasonable, what matters is that such an inference would be required; the requirement of an inference (reasonable or otherwise) is what takes such references out of the realm of direct evidence. Moreover, Plaintiffs have not pointed to any evidence tending to show that Davis and Claytor used "monkey ass" to refer only to African American employees, further calling into question Plaintiffs assertion that the term was based on race. Therefore, Plaintiffs have not raised a genuine issue of fact as to whether Davis and Claytor's use of "monkey ass" was based on Plaintiffs' race and cannot establish the third element of their respective claims for hostile work environment.

Even assuming arguendo that "monkey ass" implicates Plaintiffs' race (and thus satisfies the third element), Plaintiffs cannot establish that Defendant's alleged use of the term was sufficiently severe or pervasive to create a jury question the fourth element of Plaintiffs' claim of hostile work environment. As discussed above with respect to Smith's alleged constructive discharge, the Sixth Circuit has held that the sporadic use of the term "monkey" to refer to an employee by a manager is insufficient to create a hostile work environment. *See Ejikeme*, 307 F.

App'x at 949 (finding that scattered comments by the plaintiff's manager referring to the plaintiff as a "monkey" fell short of creating an objectively hostile work environment for purposes of Title VII); *CSX Transp.*, 643 F.3d at 513 (sporadic racial comments that black people were "monkeys" and should "go back to where they came from," were not severe enough to create a hostile work environment because although "insensitive, ignorant, and bigoted," they "more closely resembled a mere offensive utterance than conduct that is physically threatening or humiliating") (internal citations omitted). Here, the Court sees (and Plaintiffs have suggested) no reason why the Court should draw a different conclusion with regard to the alleged use of "monkey ass," particularly where Plaintiffs have offered no evidence whatsoever suggesting that the term "monkey ass" was frequently used or was used in a context that would make its use particularly humiliating to Plaintiffs. As noted above, the Court simply cannot see how any reasonable jury could conclude from Plaintiffs' vague testimony about the comments made by Davis and Claytor that such comments were "pervasive enough to significantly alter [Smith's] working conditions." *Cleveland*, 491 F. App'x at 708. Plaintiffs' testimony is "too equivocal, conclusory, and lacking in relevant detail to create a genuine dispute of material fact under Rule 56." *Viet*, 951 F.3d at 824 (internal quotations omitted).

Plaintiffs insist that "even one or a few uses of a slur in the workplace is sufficient to withstand summary judgment." (Doc. No. 31 at 17). The Court does not deny the accuracy of this statement as a matter of law. It is true that a select few words are so vile that a single utterance can alter the conditions of employment and thus create a hostile work environment. *See, e.g., Johnson v. United Parcel Serv.*, Inc., 117 F. App'x 444, 454 (6th Cir. 2004) ("Case law makes clear that the use of [the n-word], even taken in isolation, is not a mere offensive utterance.") (internal citations omitted). However, the Court sees no reason—particularly in light of *Ejikeme* and *CSX Transp.*—

to conclude that "monkey ass" is a term that falls into this narrow category. Rather, the Court finds that Plaintiffs' testimony shows, at most, nothing more than "mere offensive utterances," which "are not actionable under Title VII." *Goldfaden*, 2010 WL 2011310, at *13 (citing *Harris,* 510 U.S. at 21).

Accordingly, the Court finds that Plaintiffs have not met their burden to establish a genuine question of fact as to whether Defendant's alleged use of the term "monkey ass" was severe and pervasive enough to create a hostile work environment. Defendant is therefore entitled to summary judgment on Plaintiffs' claims of hostile work environment.

### Attorney's Fees and Costs

Via the Motion, Defendant requests that the Court award its reasonable attorney's fees and costs incurred in defending Plaintiffs' lawsuit "pursuant to *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n.*, 434 U.S. 412 (1978) insofar as Plaintiffs' action is determined to be frivolous, unreasonable, and without merit." (Doc. No. 24 at 2). The Court will deny Defendant's request for fees and costs without prejudice to filing a separate motion for fees and costs with adequate briefing explaining why such an award is warranted, and why it is warranted in the particular amount requested by Defendant. In accordance with Local Rule 54.01(b), Defendant shall file any such motion within 30 days from this Court's entry of final judgment. Should Defendant file such a motion, Plaintiffs shall respond within the time deadline and page limitation set forth in this Court's Local Rules.

### CONCLUSION

For the reasons discussed herein, Defendant's Motion (Doc. No. 24) will be GRANTED in part and DENIED in part. That is, the Court will (a) grant the Motion as to Defendant's request for

summary judgment in favor of Defendant, and (b) deny the Motion as to Defendant's request for attorney's fees and costs, without prejudice to filing a proper motion seeking such relief.

An appropriate order will be entered.

IT IS SO ORDERED.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE